Miller, J.
 

 1. coHsmmrTXONAXiUAW: legislative acts,
 
 The case before us raises the question of the validity of chapter 102 of the laws of the thirteenth general assembly granting local aid to rkil- ,
 
 J O O
 
 roads.
 

 No question of superior importance and gravity is ever presented to the courts for adjudication than one involving the validity of an act of the legislative department of the government, and none demands more careful examination and serious consideration in its determination.
 

 This is peculiarly true in this case, inasmuch as an act of like character to the one under consideration was held void by a majority of this court in
 
 Hanson et al.
 
 v.
 
 Vernon et al.,
 
 27 Iowa, 28, and that a subsequent general assembly, by the passage of the act of April, 1870, re-asserted the power denied them in that ease.
 

 If this case but involved a second time the validity of the act of 1868, annulled by this court in the case referred to, we might regard the question as to
 
 that
 
 act settled by that case, but as the general assembly has re-asserted its authority and re-enacted the law with important modifications, we have treated the question as still an
 
 *4
 
 open one, and have given it as full and careful examination and consideration as we are capable of.
 

 The first section of the act declares “that it shall be lawful for any township, incorporated town or city to aid in the construction of any projected railroad in this State, as hereinafter provided.”
 

 “ Section 2. Whenever a petition shall be presented to the council or trustees of any incorporated township, city or trustee of any township, signed by one-third of the resident tax payers of such township, city or town, ashing the question of aiding in the construction of any railroad to be submitted to the voters thereof, it shall be the duty of the trustees, or council, or board of trustees, to immediately give notice of a special election, by publication in some newspaper published in the county, if any be published therein, and also by posting said notice in five public places in each township, city or town, at least twenty days before said election, which notice shall specify the time and place of holding said election, the line of road proposed to be aided, the rate per centum of tax to be raised, and the township or townships, incorporated town or* city in which such tax shall be expended; at which election the question of ‘ taxation ’or no taxation ’ shall be submitted, and if a majority of the votes polled be ‘for taxation,’ then, in that case, the township clerk, recorder, or clerk of said election shall forthwith certify to the county auditor the rate per centum of the tax thus voted by such township, city or town. The board of supervisors shall, at the time of levying the ordinary taxes next following said special election, levy all taxes voted under the provisions of this act, and cause the same to be placed on the tax lists of the proper townships, cities or towns, and said taxes shall be collected at the same time, in the same manner, and be subject to the same penalties for non-payment, as other taxes;
 
 provided,
 
 that the aggregate amount of tax levied under the provisions of this act, in any township, city or
 
 *5
 
 town, shall not exceed five per centum of the assessed value of the property of said township, city or town.
 

 “ Section 3. The funds collected under the provisions of this act shall be paid out by the county treasurer to the treasurer of the railroad company, upon the orders of the president or managing director of the railroad company whose road such tax has been voted to aid; which orders shall be accompanied by sworn estimates of the engineer in charge of the work on such road, showing that double the amount of such orders has been expended for the construction of such road, in accordance with the terms of the notice provided for in section two of this act, and also by a certificate signed by the members of the council, or board of trustees, or a majority of the 'members thereof, of the township, city or town voting the tax for which said orders are drawn, to the effect that the provisions of this act have been so complied with as to entitle said company to the amount called for by such orders; and it is hereby expressly provided that no part of the funds raised under the provisions of this act shall be expended in any other townships than those specified in the notice of election;
 
 provided, however,
 
 that should the taxes not be drawn from the county treasury in accordance with the provisions of this act by the railroad company in whose favor the same may have been voted, within two years after the date of the collection thereof, then the right of said railroad company to said funds shall be deemed forfeited, and the same shall be repaid by the county treasurer to the persons from whom the same may have been collected.
 

 “ Section 4. All railroads constructed by, or with the aid of, any taxes levied and collected under the provisions of this act, shall be subject to the control of the general assembly in regard to the management of the same and the charges for the transportation of freight and passengers thereon.”
 

 The authority and power of the courts to annul an act
 
 *6
 
 of the legislature, in conflict with the fundamental law, has been repeatedly asserted and is now universally acknowledged. While this authority is unanimously conceded, the cases, with entire uniformity, hold that it is never to be exercised in doubtful cases.
 

 The supreme court of New York, in
 
 Clark
 
 v.
 
 The People,
 
 26 Wend. 599, says, that “ the power of the courts of justice to declare the nullity of legislative acts which violate the provisions either of the constitution of the United States or of the State, while it is undoubted, should be exercised with extreme caution, and never where a serious doubt exists as to the true interpretation of the provisions alleged to be repugnant.
 

 In Illinois it is said that the true inquiry is, whether “ the will of the representatives, as expressed in the law, is, or is not, in conflict with the will of the people as expressed in the constitution, and unless it is clear that the legislature has transcended its authority, the courts will not interfere.
 
 Lane et al.
 
 v.
 
 Dorman et
 
 ux., 3 Scam. 238.
 

 See also, in support of this rule, the following cases:
 
 Foster et
 
 al. v.
 
 The Essex Bank,
 
 16 Mass. 245;
 
 The Farmers & Mechanics Bank
 
 v.
 
 Smith,
 
 3 Serg. & R. 63, 73.
 

 Many other cases might be cited, but I forbear, as this court has frequently declared the same doctrine.
 

 In
 
 Santo
 
 v.
 
 The State,
 
 2 Iowa, 208, it is said by Mr. Justice Woodward that, “ although the power is universally admitted, its exercise is considered of the most delicate and responsible nature, and is not resorted to unless the case be clear, decisive and unavoidable. It is the duty of the court to give an act such construction, if possible, as will maintain it.
 
 Rice
 
 v.
 
 Foster,
 
 1 Harr. (Del.) 179;
 
 Fisher
 
 v.
 
 McGin, etc.,
 
 1 Gray, 1;
 
 Maize
 
 v.
 
 The State,
 
 4 Ind. 342;
 
 Commonwealth
 
 v.
 
 Williams,
 
 11 Penn. 61;
 
 State
 
 v.
 
 Cooper,
 
 5 Blackf. 258; 2 Pet. 522;
 
 Ogden
 
 v.
 
 Saunders,
 
 12
 
 *7
 
 Wheat. 270; 19 Johns. 58; 1 Com. 550;
 
 Calder
 
 v.
 
 Bull,
 
 3 Dall. 386;
 
 Fletcher
 
 v.
 
 Peck,
 
 6 Cranch, 87.
 

 In the case of
 
 Morrison
 
 v.
 
 Springer,
 
 15 Iowa, 304, this court held that it “ will declare a law unconstitutional
 
 only
 
 when it is
 
 clearly, palpably and plainly inconsistent
 
 with the provisions of that instrument; ” and Mr. Justice Wright, in his opinion in that case, cites a long list of authorities in support of the rule announced. See, also,
 
 McCormick
 
 v.
 
 Rusch,
 
 15 Iowa, 127;
 
 Whiting & Whiting
 
 v.
 
 City of Mt.
 
 Pleasant, 11 id. 482-485;
 
 McGregor
 
 v.
 
 Bayles,
 
 19 id. 43;
 
 Duncombe
 
 v.
 
 Prindle,
 
 12 id. 1.
 

 The same rule of construction has been declared in Massachusetts, Pennsylvania and other States.
 
 Adams
 
 v.
 
 Howe,
 
 14 Mass. 345;
 
 Sharpless
 
 v.
 
 The Mayor, etc.,
 
 21 Penn. 162;
 
 Thorp
 
 v.
 
 R. R. Co.,
 
 21 Vt. 142;
 
 The People
 
 v.
 
 Draper,
 
 15 N. Y.
 

 Having seen that courts of justice are authorized to declare a legislative act unconstitutional and void, only when it violates that instrument
 
 cleanly, palpably, plainly,
 
 and in such a manner as to leave no reasonable doubt, we proceed to inquire whether there is any check or legislative power independent of, or in addition to, those which are to be found in the constitution, or, in other words, whether the courts possess the power to annul an act of the legislature for any other reason than that of its
 
 jflam,, clean and palpable
 
 violation of the
 
 written
 
 constitution.
 

 It is said that “ the judiciary may arrest acts of the legislature on the ground that they are unjust and immoral;” “ that there are certain principles of natural justice which not even the legislature can be permitted to disregard.” It is conceded that the power of the legislature must be confined to “making laws.” It cannot administer or execute them. So the very words of the constitution, which vests the power of legislation in the general assembly, exclude the judiciary from any share in it; and such share they will undoubtedly possess if they are at liberty to refuse to execute a statute, on the ground that it is not
 
 *8
 
 in harmony with their notions of morality and justice. Mr. Sedgwick, in his work on statutory and constitutional law, says: “ Constitutional provisions may be ambiguous; the doctrine of interpretation is vague; but these branches of judicial authority are subject to some tests and can be circumscribed within Some limits. But who will undertake to decide what are the principles of eternal justice ? And who can pretend to fix any limits to the judicial power, if they have the right to annul the operations of the legislature on the ground that they are repugnant to natural right ? There may be, there always will be, questions, not only as to the expediency but the justice of laws. But questions of public policy and State necessity are not meant to be assigned to the domain of the courts. The right of construction, the right of applying constitutional restrictions, are vast powers, which it will always require great sagacity and intelligence to exercise. Let the judiciary rest contented with its acknowledged prerogatives, and not attempt to arrogate an authority so vague and so dangerous as the power to define and declare the doctrines of natural law and abstract right,” in the construction of statutes. * Sedg. on Stat. and Con. Law, 182
 

 These views of the learned author we approve and adopt. The same views are held by many of the soundest judges and legal writers.
 

 Mr. Justice Cowen, of the New York supreme court, in
 
 Butler
 
 v.
 
 Pilmer,
 
 1 Hill, 324, holds this language: “Strong expressions may be found in the books against legislative interference with vested rights; but it is not conceivable that, after allowing the few restrictions found in the federal and State constitutions, any further bounds can be set to legislative power by written prescription.” And Chancellor Kent says: “Where it is said that a statute is contrary to natural equity or .reason, or repugnant or impossible to be performed, the cases are understood to mean that the court is to give them a reasonable
 
 *9
 
 construction. They will not presume that every unjust or absurd consequence was within the contemplation of the law.” 1 Kent’s Com. 408.
 

 And Mr. Justice Baldwin, of the supreme court of the United States, used this language: “We cannot declare a legislative act void because it conflicts with our opinions of policy, expediency or justice. We are not the guardians of the rights of the people of the State unless they are secured by some constitutional provision which comes within our judicial cognizance. The remedy for unwise or oppressive legislation, within constitutional bounds, is by appeal to the justice and patriotism of the representatives of the people. If this fail, the people, in their sovereign capacity, can correct the evil; but the courts cannot assume their rights.” There is no
 
 pa/ramou/nt
 
 and
 
 supreme
 
 law which defines the law of nature, or settles those great principles of legislation which are said to control State legislatures in the exercise of the powers conferred on them by the people in the constitution.”
 
 Bennett
 
 v.
 
 Boggs,
 
 1 Bald. 74, 75. See, also, in support of the same views,
 
 Cochran
 
 v.
 
 Van Surley,
 
 20 Wend. 381;
 
 Kirby
 
 v.
 
 Shaw,
 
 7 Harris (Penn.), 258;
 
 State
 
 v.
 
 Dawson,
 
 2 Hill (S. C.), 100;
 
 People
 
 v.
 
 Mayor of Brooklyn,
 
 4 Coms. 423;
 
 Town of Guildford
 
 v.
 
 Cornell,
 
 18 Barb. 615;
 
 Sharpless
 
 v.
 
 The Mayor, etc.,
 
 21 Penn. 147;
 
 Braddee
 
 v.
 
 Brownfield,
 
 2 Watts
 
 &
 
 Serg. 271;
 
 Harvey
 
 v.
 
 Thomas,
 
 10 Watts, 63;
 
 Calder
 
 v.
 
 Bull,
 
 3 Dall. 386;
 
 Fletcher
 
 v.
 
 Peck,
 
 6 Cranch, 87;
 
 Bloodgood
 
 v.
 
 Mohawk and Hudson R. R. Co.,
 
 18 Wend. 9;
 
 Terret
 
 v.
 
 Taylor,
 
 9 Cranch, 43;
 
 Bonaparte
 
 v.
 
 Camden and Amboy R. R. Co.,
 
 1 Bald. C. C. 205.
 

 There are authorities which hold the contrary doctrine, and in doing so usually take refuge behind that clause in the bill of rights which declares, “the enumeration of rights shall not be construed to impair or deny others, retained by the people.”
 

 Now let us inquire
 
 what
 
 legislative rights, other than
 
 *10
 
 those contained in the constitution, ai’e “ retained by the people.”
 

 The second section of the “bill of rights” declares: “
 
 All political power is inherent in the
 
 people.” Political power consists of the three great attributes of sovereignty, namely:
 
 legislative, executive
 
 and
 
 judicial
 
 authority. This is
 
 all inherent
 
 in the people. These powers, then, are supreme in the people in the first instance.
 
 All the legislative
 
 as well as the executive and judicial power is inherent in them. By section 1 of article 3 of the constitution, we find that
 
 The
 
 legislative authority of this State shall be vested in a general assembly,” etc.
 

 The people, then, have vested
 
 the
 
 legislative authority,
 
 inherent in them,
 
 in the general assembly. The people were the original possessors of
 
 all
 
 the legislative authority in the State. By this section they vest it
 
 all
 
 in the general assembly. Subsequently, in the same instrument, they withdraw some portions of this authority and impose certain restrictions upon the exercise of the authority granted. It follows, therefore, as a logical sequence, that, within these limitations and restrictions, the legislative power of the general assembly is supreme; that it is bounded only by the limitations
 
 written
 
 in the constitution. Weight, J., in
 
 Morrison
 
 v.
 
 Springer,
 
 15 Iowa, 342, says: “ The legislature clearly has the power to legislate on all rightful subjects of legislation, unless expressly prohibited from so doing, or where the prohibition is implied from some express provision.
 
 This theory must never be lost sight of by the courts in examining the powers of the legislature. It is elementary, cardinal,
 
 and frequently possesses controlling weight in determining the constitutional validity of their enactments.
 
 The general assembly possesses all legislative authority
 
 not delegated to the general government,
 
 or prohibited by the constitution.”
 

 Thus, it seems clear by logical deduction, and upon the
 
 *11
 
 most abundant authority, that this court has no authority to annul an act of the legislature unless it is found to be in clear, palpable and direct conflict with the written constitution.
 

 2._taxation of^aüroads^aet of isto.
 
 "We come now to inquire whether the act of 1870, authorizing local aid to railroads, is so
 
 clewrkj, palpably and dvreeily
 
 in violation of our State constitution as that it becomes the province of this court to annul it.
 

 It is urged that the act, in providing for the levy and collection of a tax, which when collected is to be paid over to a private corporation, is unconstitutional, on the ground that it conflicts with section eighteen of the “bill of rights,” which declares: “Private property shall not be taken for public use without just compensation first being made, or secured to be made, to the owner thereof,” etc. The argument is, that, by implication, the taking of private property for
 
 primate
 
 use is forbidden by this section.
 

 That the legislature has no constitutional authority to take the private property of A. and give it to B. there can be no reasonable doubt.
 

 The difficulty, however, seems to be in ascertaining what is a
 
 public use,
 
 and what a
 
 prvoaie use,
 
 within the meaning of this section. This clause is a restriction upon the right of eminent domain. But for this restraint the legislature would have power to authorize the taking of private property for public use without making any compensation. The right to exercise the power of eminent domain
 
 only
 
 exists when the object is a public one. Every State exercises this power in behalf of railroads, turnpikes, canals and other internal improvements, and this is done without reference to whether the State holds any pecuniary interest in the improvement or not. "Upon our statute book will be found laws of this character. It has been the law of this State for twenty years without question,
 
 *12
 
 that, “ Whenever any corporation or other person designs to construct a canal or railroad, a turnpike, graded, macadamized or plank road, or a bridge, as a work of
 
 public utility although for pri/oate profit,
 
 it may take such reasonable amount of private real property as may be requisite for a'right of way, etc., upon paying such sum as may be assessed, etc. Rev. of 1860, § 1278. So also the act of 1853, granting the right of way to railroad companies alone. Rev. p. 218.
 

 And it has been the law of this State for more than a quarter of a century, that any private citizen who will erect a
 
 mill
 
 to grind grain for toll, may erect a dam and have a writ
 
 ad quod damnum
 
 for the condemnation of the land overflown, as for a public purpose. Laws of 1843, ch. 102; id. of 1855, ch. 92 (Rev. § 1264); id of 1866, ch. 119.
 

 The validity of these statutes, and that the purposes were
 
 public
 
 ones, within the meaning of the constitution, although, in the language of section 1278 of the Revision, it be “ for
 
 primate profit,”
 
 has been too often and too uniformly recognized to be now disputed. See
 
 Gammell
 
 v.
 
 Potter,
 
 6 Iowa, 548;
 
 Lummery
 
 v.
 
 Braddy,
 
 8 id. 33; see also
 
 Cowgill
 
 v.
 
 Essex Mill,
 
 6 Pick. 94;
 
 Boston
 
 v.
 
 Newman,
 
 12 id. 467.
 

 These acts can be sustained only on the ground that the objects.to be promoted by them
 
 were public ;
 
 that the exercise of the right of eminent domain in behalf of railroads, canals, turnpikes, plank roads, bridges, mills, etc., is upon the principle, that being of
 
 “public utility
 
 although for
 
 “primate profit”
 
 they are f
 
 or public use,”
 
 within the meaning of the constitution.
 

 The eases are numerous and uniformly in accord with this view.
 

 The right of the legislature to exercise the power of eminent domain in behalf of railroads has always been upheld by the courts on the ground that the
 
 use was a
 
 
 *13
 

 public one.
 
 Indeed this is elementary and unquestionable!. See 2 Kent’s Com. 339, 340;
 
 Beekman
 
 v.
 
 The Saratoga, & S. R. R. Co.,
 
 3 Paige, 45.
 

 The ease last cited is the leading American case upon this subject. . The point was expressly made, that taking
 
 primate
 
 property for the use of a railroad was not taking it for
 
 public use,
 
 and therefore forbidden by the constitution of New York. The clear and conclusive language of the chancellor has often been quoted and followed, and never overruled.
 

 In speaking of the power of eminent domain, he says:
 
 “
 
 The right of
 
 eminent domcuvn
 
 does not, however, imply a right in the sovereign power to take the property of one citizen and transfer it to another, even for a full compensation,
 
 where the public interest will be in no way promoted by such t/rcmsfer.
 
 But if
 
 th& public interest cam, be bn cmy way
 
 promoted by the taking of private property,
 
 it must rest in the wisdom, of the legislalwre,
 
 to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain and to interfere with the private rights of individuals for that purpose. It is upon this principle that the legislature of several States have authorized the condemnation of the lands of individuals for mill sites, where from the nature of the country such mill sites could not be obtained for the accommodation of the inhabitants without overflowing the lands thus condemned.
 
 Upon the same principle of public benefit,
 
 not only the agents of the government, but also
 
 i/ndmidmcds a/nd corporate bodies
 
 have been authorized to take private property for the purpose of making public highways,
 
 Iwrnpike roads
 
 and canals; of erecting and constructing wharves and basins; of establishing ferries; of draining swamps and marshes, and of bringing water to cities and villages.
 
 In all such cases
 
 the object of the legislative power is the public benefit derived from the contemplated improvement, whether
 
 *14
 
 such improvement is to be effected directly by the agents of the government, or through the medium of
 
 corporate bodies, or of indimidnal
 
 enterprise.”
 

 Chief Justice Marshall, in the case of
 
 Wilson
 
 v.
 
 Blackbird Creek Marsh Co.,
 
 2 Pet. 251, says: “Measures calculated to produce
 
 such
 
 benefits to the public, though effected through the medium of a
 
 primate corporation,
 
 are undoubtedly within the powers reserved to the States.”
 

 In
 
 Swan
 
 v.
 
 Williams,
 
 2 Mich. 427, the question before the court was, whether “ property taken by a railroad company was a taking for
 
 public use
 
 within the meaning of the constitution,” and it was decided in the affirmative. Mr. Justice Martin in that case says: “ Most certain it is that as to all their rights, powers and responsibilities,
 
 three
 
 grand classes of corporations exist: 1st, political or municipal óorporations, such as counties, towns, cities and villages, which from their nature are subject to the unlimited control of the legislature; 2d, those associations which are created for
 
 public benefit,
 
 and to which the government delegates a portion of its sovereign power to be exercised for
 
 public utility,
 
 such as turnpike, bridge, canal and railroad companies; and, 3d, strictly
 
 private
 
 corporations, where th
 
 q primate interest
 
 of the corporators
 
 istlne primary
 
 object of the association, such as banking, insurance, manufacturing and trading companies.” “ The
 
 object
 
 defines the
 
 character
 
 of these associations, by whatever name they may be styled.”
 

 The learned judge further says, that in the creation of thát class of corporations to which railroad companies belong, “ the public duties and public interests are involved, and in the discharge of these duties, and the attainment of these interests, are the primary objects to be worked out through the powers delegated to them. To secure these, the right of pre-eminent sovereignty is exercised by the condemnation of lands to their use, a right which can
 
 *15
 
 never be exercised for private purposes. How, then, can they be regarded as
 
 private
 
 associations?
 

 “Nor can it be said that the property, when taken, is not used by the public, but by the corporation for its own benefit and advantage. It is unquestionably true that these enterprises may be, and probably always,are, undertaken with a view to private emoluments on the part of the corporators, but it is none the less true that the object of the government in creating them is
 
 publAc utility,
 
 and that private benefit, instead of being the occasion of the grant, is but the reward springing from the service. If this be not the correct view, then we confess we are unable to find any authority in the government to accomplish any work of public utility through any private medium, or by delegated authority; yet all past history tells us that governments have more frequently effected these purposes through the aid of corporations and companies than by their immediate agents; and all experience tells us that this is the most wise and economical method of securing these improvements.”
 

 In support of these views see the following cases:
 
 Blodgett
 
 v.
 
 Mohawk & H. R. R. R. Co.,
 
 18 Wend. 1; 7 Pick. 496; 2 N. H. 25; 20 Johns. 442, 443;
 
 Stewart
 
 v.
 
 Land,
 
 1 Cranch, 299;
 
 Amboy Turnpike,
 
 5 Johns. Ch. 112;
 
 Pratt
 
 v.
 
 Brown,
 
 3 Wis. 612;
 
 Robins
 
 v.
 
 R. R.,
 
 6 id. 636;
 
 Soens
 
 v.
 
 Racine,
 
 10 id. 280;
 
 Corp. of N. Y.
 
 v.
 
 Coates,
 
 7 Cow. 585.
 

 The right to exercise the power of eminent domain in behalf of railroads and other improvements of public utility is recognized by all courts, and denied by no one. While admitting this right it is said that the legislature has no constitutional power to levy a tax on the property of the citizens in aid of a railroad corporation, because it is a mere private enterprise.
 

 It has been abundantly shown that the
 
 object
 
 for which the right of eminent domain is exercised is a
 
 pubMc
 
 one,
 
 *16
 
 for
 
 puhUc
 
 utility, for
 
 ‘•public use,”
 
 within the meaning of the constitution; that this right can be exereiséd in behalf of these corporations upon no other ground. If, then, the building óf a railroad is a public object so as to authorize the taking of the private real property of the citizen — the highest species of property — for a right of way, is it any less a public object for the purpose of receiving aid through the medium of taxation to assist in building the road upon such right of way? The right of eminent domain and the taxing power are both sovereign powers. The former is limited to
 
 public uses
 
 by express words in the constitution. The latter is not, nor is it limited at all except that the legislature shall not pass any law to compel any person “ to pay tithes, taxes, or other rates, for building or repairing places of worship, or the maintenance of any minister or ministry.” Conceding, however, that the taxing power
 
 ought
 
 not to be exercised, except in behalf of a public object, it is unquestionable that it may be exercised for public purposes — for any object that will justify the exercise of the right of eminent domain. If the State can, for any purpose, take the land of a citizen, it may tax him fór a like purpose. The object or purpose should be a public one in either case. But it would be absurd to say that the right of the citizen to prevent his property from being taken for other than public uses, which is secured by express constitutional limitation, may be overridden, but that his right to save his money from being applied, through the process of taxation, to other than public uses, which right is
 
 not
 
 embodied in the constitution, must be respected. And yet such absurdity is involved in the position that the citizen’s real property may be taken absolutely to aid in the construction of a private enterprise — a railroad — while his money cannot be taken by the process of taxation to aid in the same enterprise. The proposition is that you may not tax the property holder to aid the construction of a railroad, although the taxing power
 
 *17
 
 is not limited in the constitution, yet you may take his land for the same purpose, notwithstanding the right to thus take is limited to “public purposes.” If the taxing power cannot be constitutionally invoked in aid of railroads, neither can the power of eminent domain. If the act under consideration is in conflict with the constitution, in that it taxes the people in aid of the construction of railroads (or, rather, allows the people to tax themselves), then all the legislation of this and every other State, invoking the power of eminent domain in behalf of railroads, and other like internal improvements, are unconstitutional; and all the adjudications of the courts for more than a century, sustaining such exercise of the right of eminent domain, are based upon false premises, and are erroneous. To be consistent we must hold these corporations and the object and purpose of their creation to b
 
 e private,
 
 and that neither the power of eminent domain nor the power of taxation can be invoked to aid in their construction, or that they are created for
 
 public utility,
 
 to promote the public interest and convenience, and that both of these powers may be constitutionally exercised to aid in their construction. If they
 
 are private
 
 interests for the one purpose, they are also for the other. If they are public for one, they are for the other. If the taking of private property for the right of way of a railroad is a taking for
 
 “public
 
 use,” so also is the imposition of a tax to aid in the construction of the road an exercise of the taxing power for
 
 & public purpose.
 
 This view is in accord with the whole course of legislation of all the States, in regard to internal improvements, and is sustained by a current of judicial decisions that cannot be consistently repudiated.
 

 Every railroad, canal and turnpike road in the United States has been built by the aid of such legislation— granting to them a right of way — based.upon the principle that the
 
 object
 
 was a
 
 public
 
 one, justifying the invoca
 
 *18
 
 tion of sovereign power in their construction. This species of legislation, whether in the nature of grants of right of way to railroads, canals and turnpikes, or by authorizing local aid, through the process of taxation, in their construction, has been sustained by the highest courts of almost every State in the Union, upon this ground and upon none other.
 

 In addition to cases already cited herein, see the following:
 
 Livingston
 
 v.
 
 Mayor of New York,
 
 8 Wend. 85 ;
 
 In Matter of opening Furman street,
 
 17 id. 649;
 
 Sutton's Heirs
 
 v.
 
 Louisville,
 
 5 Dana, 30;
 
 City of Lexington
 
 v.
 
 McQuillen's Heirs,
 
 9 id. 513.
 

 4.
 
 — Taxing power not limited.
 
 While the right to take private property for public use is conditioned upon making compensation, the taxing power is not thus limited. Indeed, the very idea ot taxation implies the power to collect levies of money from the people without making any direct pecuniary compensation. The only revenue possessed by the State is derived from taxation, and it would be absurd to say that she should compensate the citizen for taxes collected.
 

 It is well settled that this clause of the constitution requiring compensation to be made where private property is taken for public use is not a limitation upon the taxing power. See the following cases:
 
 The People
 
 v.
 
 Mayor of Brooklyn,
 
 4 Coms. 423;
 
 Town of Guilford
 
 v.
 
 Cornell,
 
 18 Barb. 615 ;
 
 The Same
 
 v.
 
 Supervisors of Chenango Co.,
 
 3 Kern. 147;
 
 Kirby
 
 v.
 
 Shaw,
 
 19 Penn. 258;
 
 Williams
 
 v.
 
 Mayor of Detroit,
 
 2 Mich. 560;
 
 McMasters
 
 v.
 
 Commonwealth, 3
 
 Watts, 292;
 
 In the Matter of the District of Pitts-burg,
 
 2 Watts and Serg. 320;
 
 In the Matter of Fenton's Petition,
 
 7 Penn. 173;
 
 Extension of Hancock street,
 
 18 id. 26;
 
 Sharpless
 
 v.
 
 City of Philadelphia,
 
 9 Harris, 147;
 
 Schenly and wife
 
 v.
 
 Allegheny City,
 
 25 Penn. 128;
 
 Nichols
 
 v.
 
 Bridgeport,
 
 23 Conn. 189;
 
 Griffin
 
 v.
 
 The Mayor,
 
 4 Coms. 419;
 
 Commomoealth
 
 v.
 
 Alger,
 
 7 Cush.
 
 *19
 
 53 ;
 
 Cummings
 
 v.
 
 Police Jury,
 
 9 La. 503;
 
 Moers
 
 v.
 
 City of Reading,
 
 21 Penn. 188;
 
 Slick
 
 v.
 
 Maysville and Lex. R. R. Co.,
 
 13 B. Mon. 1;
 
 Justices of Clarke Co.
 
 v.
 
 P. W. & R. R. Turnpike Co.,
 
 11 id. 143.
 

 5 _judicial limitation.
 
 The taxing power being one of the sovereign powers vested in the general assembly by the people, and not being limited, either expressly or by clear implication, in the constitution, to the condition of making compensation, the judicial power possesses no authority to thus limit it.
 
 t
 

 The conclusion therefore is, that as the legislature may constitutionally exercise the right of eminent domain which
 
 is
 
 limited by the constitution, in aid of the construction of railroads and other internal improvements of public utility, so also may it exercise the taxing power, which is
 
 not
 
 limited, in aid of the same objects.
 

 It is objected that a railroad differs from other public highways, such as turnpikes and canals, because travelers cannot use it with their own carriages, and farmers cannot transport their own produce in their own vehicles. Chancellor Walworth answering this objection says:
 
 “ If the making of a railroad will enable the tra/oeler to go from one place to another without the expense of a carriage and horses,
 
 he derives a
 
 greater benefit
 
 from the improvement than if he was compelled to travel with his own conveyance over
 
 a Iwrnpike road at the same expense.
 
 And if a mode of conveyance has been discovered by which a farmer can procure his produce to be transported to market at half the expense which it would cost him to carry it there with his own wagon and horses, there is no reason why
 
 th% public should not enjoy the benefit of the discovery.
 

 “ The
 
 public
 
 have an
 
 interest in the use of the railroad,
 
 and the owners may be prosecuted for damages sustained, if they refuse to transport an individual, or his property, without reasonable excuse, upon being paid the usual rate
 
 *20
 
 of fare.”
 
 Beekman
 
 v.
 
 The Saratoga & S. R. R. Co.,
 
 3 Paige, 45.
 

 And in
 
 Swan
 
 v.
 
 Williams,
 
 2 Mich. 427, the court says: “ The fact that upon railroads individuals do not travel or transport property in their own vehicles
 
 furnishes no argument in this
 
 particular, from the fact that the nature of the road, as well as the personal safety of individuals, renders it impossible that it should do so.”
 

 6,_biU of rights.
 
 It is also said that the last clause of the 9th section of the “bill of rights,” which declares that “no person 'shall be deprived of life, liberty, or property, without
 
 proGess 0† law,”
 
 js infringed by the act of 1870.
 

 “ Due process of law,” means ordinary judicial proceedings in court.
 
 Boyd
 
 v.
 
 Ellis,
 
 11 Iowa, 99;
 
 Ex parte Grace,
 
 12 id. 214;
 
 Taylor
 
 v.
 
 Potter,
 
 4 Hill, 140. So that if this clause of the constitution is held to apply to the taxing power, then.no tax whatever for the support of the government can legally be levied and collected, except through the means of judicial proceedings in the courts; whereas it is well known that the sovereign power of taxation belongs exclusively to the legislative department of the government, and that all taxes are levied and collected in pursuance of legislative enactments, without the aid of the courts. This clause has no reference whatever to the taxing power, and where property is taken in the lawful exercise of the taxing power, it is not taken “without due process of law.”
 
 Allen v. Armstrong, 16
 
 Iowa, 512;
 
 McCarroll
 
 v.
 
 Weeks,
 
 2 Tenn. 215;
 
 Harris
 
 v.
 
 Wood,
 
 6 B. Mon. 643;
 
 Livingston
 
 v.
 
 Moore,
 
 7 Pet. 669.
 

 7.
 
 prior decisions.
 
 It was said by Chief Justice Dillon, in
 
 Eanson v. Vernon, supra,
 
 that this court in the "Wapello county case (13 Iowa, 388), had held that “ The legislature could n0t, under any circumstances, pass an act which will make it lawful for a county or city, in its corporate capacity, to subscribe stock in a railroad company,” and
 
 *21
 
 that it was impossible “ to hold the act of 1868 to be valid and yet stand by the decision” in that case.
 

 When it is remembered that until the act of 1868, no act of the legislature of Iowa
 
 purporting
 
 to authorize any thing of the ldnd was held invalid by this court, and that no such question was before the court in the Wapello county case, or in any other of the numerous cases involving the validity of city and county railroad bonds, it will be plain enough that whatever may have been said about the constitutionality of an act authorizing the issue of bonds by municipal corporations was only
 
 dtichwm.
 
 The real decision, in the case in 13 Iowa, was, that the legislature had never authorized the municipal corporations of this State to subscribe stock to railroads, issue bonds and levy and collect taxes to pay the same, and that those muniQipal corporations possessed no power independent of express legislative authority to subscribe to the stock of railroad companies, issue bonds therefor, and levy and collect local taxes to pay the same. To that decision, and to the whole series of decisions of this court holding invalid county and city bonds, issued for that purpose, we give our unqualified approval. But it is given on the grounds that the general assembly had never passed any act conferring the power, and that without such legislation it did not exist.
 

 The question of the constitutional power of the legislature to authorize municipal corporations to aid by local tax in the construction of railroads, within the territory of such municipal corporations, has been before the highest judicial tribunals of at least twenty-one of the States and the supreme court of the United States, and in every instance the power has been affirmed, until quite recently in the supreme courts of Michigan and Wisconsin, and in this court in the case of
 
 Hanson
 
 v.
 
 Vernon.
 
 See the following cases: Sha
 
 rpless
 
 v.
 
 The
 
 Mayor,
 
 etc.,
 
 21 Penn. St. 147;
 
 Commonwealth
 
 v.
 
 Perkins,
 
 43 id. 410 ;
 
 The People ex rel.
 
 v.
 
 Mitchell,
 
 35 N. Y. 550;
 
 Clarke
 
 v.
 
 The City of
 
 
 *22
 

 Rochester,
 
 28 id. 605;
 
 Gould
 
 v.
 
 The town of Venice,
 
 29 Barb. 442;
 
 Slack
 
 v.
 
 Cily of Maysviile,
 
 13 B. Mon. 1;
 
 Maddox
 
 v.
 
 Graham,
 
 2 Met. (Ky.) 56;
 
 Nicoll
 
 v.
 
 Mayor,
 
 9 Humph. (Term.) 252;
 
 Goddin
 
 v.
 
 Cramp,
 
 8 Leigh (Va.), 120;
 
 City of Bridgeport
 
 v.
 
 Housatonic R. R. Co.,
 
 15 Conn. 475 ;
 
 Society for Savings
 
 v.
 
 New London,
 
 29 id. 174;
 
 Cin. R. R. Co.
 
 v.
 
 Commissioners,
 
 1 Ohio St. 77;
 
 State, etc.,
 
 v.
 
 Commissioners,
 
 12 id. 596;
 
 Shoemaker
 
 v.
 
 Goshen,
 
 14 id. 569;
 
 Prettyman
 
 v.
 
 Supervisors,
 
 19 Ill. 406;
 
 Butler
 
 v.
 
 Dunham,
 
 27 id. 474, and cases cited;
 
 Gibbons
 
 v.
 
 Mobile, etc., R. R. Co.,
 
 36 Ala. 410;
 
 Robinson
 
 v.
 
 Bidwell,
 
 22 Cal. 379;
 
 The Commissioners
 
 v.
 
 Bright,
 
 18 Ind. 93;
 
 The City of Aurora
 
 v.
 
 West,
 
 22 id. 88;
 
 Augusta Bank
 
 v.
 
 Augusta,
 
 49 Me. 407;
 
 Clarke
 
 v.
 
 Janesville,
 
 10 id. 130;
 
 Mills
 
 v.
 
 Glason,
 
 11 id. 470;
 
 Caldwell v
 
 .
 
 Justices of Burke,
 
 4 Jones Eq. (N. C.) 323;
 
 Powers
 
 v.
 
 The Inf. Ct. Dougherty Co.,
 
 23 Geo. 65;
 
 The St. Joe. & C. R. R. Co.
 
 v.
 
 Buchanan Co.,
 
 39 Mo. 485;
 
 City of St. Louis
 
 v.
 
 Alexandria,
 
 23 id. 183;
 
 Strickland
 
 v.
 
 Miss. R. R. Co.,
 
 27 Miss. 209, 224;
 
 Cotton
 
 v.
 
 Com. of Leon Co., 5
 
 Fla. 610;
 
 Police Jury
 
 v.
 
 Succession of McDonough,
 
 8 La. 341;
 
 San Antonio
 
 v.
 
 Jones,
 
 28 Texas, 19;
 
 Gilman
 
 v.
 
 Sheboygan,
 
 2 Black. 510, and cases cited.
 

 We find, then, that upon principle and reason there is the same authority for the exercise of the sovereign power of taxation in aid of the construction of railroads that there is for the exercise of the right of eminent domain, and that this view is sustained by an overwhelming weight of authority. Our plain duty, therefore, is to sustain the act in question. And the question whether its enactment was dictated by a wise State policy or not we must leave to the general assembly, where it exclusively belongs under the constitution.
 

 The order of the district judge, refusing the injunction, is
 

 Affirmed.