### ATLANTIC COAST LINE R. CO. v. FINN.

(Circuit Court of Appeals, Fourth Circuit. April 9, 1912.)

#### No. 1,057.

1. MASTER AND SERVANT (§ 100*)—RELIEF DEPARTMENT—ACCEPTANCE OF BENE-
FITS—EFFECT.

Under Act March 7, 1905 (24 St. at Large, p. 962), which provides that an employé's acceptance of benefits from a relief department maintained by his employer shall not bar recovery against the latter for injury, a railway company's liability for injury to an employé is not released by the employé's acceptance of such benefits, though the contract out of which the release is claimed arose was made before the act was passed.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 166–170; Dec. Dig. § 100.*

Acceptance of benefits from relief associations or insurance procured by master as affecting master's liability for injuries to servant, see note to Atlantic Coast Line R. Co. v. Dunning, 94 C. C. A. 139.]

2. MASTER AND SERVANT (§ 286*)—RAILROADS—INJURY TO EMPLOYÉ—NEGLI-
GENCE—JURY QUESTION.

In an action against a railway company for injury to an employé resulting from a broken brake on the caboose in which he was riding, held, under the evidence, a jury question whether the company was negligent.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1010–1050; Dec. Dig. § 286.*]

In Error to the Circuit Court of the United States for the District of South Carolina, at Charleston.

Action by P. P. Finn against the Atlantic Coast Line Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

On the 17th day of November, 1905, the plaintiff below, Finn, had been for a number of years, in the employ, as engineer, of the railroad company, defendant below. At the time, however, he was suspended under charges of an alleged dereliction of duty. In response to a telegram from the company's master mechanic, he on that day started to go from his home at Sumpter, to Florence, S. C., aboard one of the company's regular trains. En route, at Lynchburg, he saw the master mechanic aboard another train going in the other direction towards Sumpter, but not in time to leave his train and board the other. On his arrival at Florence he boarded a freight train that

was going back to Sumpter. This freight train, known as No. 11, was made up of a number of box cars, a flat car, and a caboose. He was riding in the caboose. At Cartersville, an intermediate station between Florence and Sumpter, this freight train undertook the operation of "kicking" the flat car into a side track. To do this the caboose was cut off the train while in motion and the train proceeded on the main line beyond the north or far end of the side track, the intention being to uncouple the flat car, propel it into the side track, close the side track, so that the train could roll back on the main track to the caboose, stopped in the meantime thereon. The brake on the caboose was broken so that the brakeman could not stop it. It rolled on to the clear post at the north end of the side track, by reason whereof the flat car could not be "kicked" into the side track without its "side swiping" the caboose. To avoid this, the switch to the side track was quickly closed, and the full force of the backing train was sustained by the caboose. Finn, in the caboose, was thrown from his seat against its sliding door and injured.

More than five years thereafter, on December 21, 1910, he filed his complaint in the court below, alleging such injury, and charging it to be resultant from the negligence of the company by reason of its operating the caboose with the broken brake.

The company for defense denied generally the injury as alleged, and the negligence charged, and set up specially the existence of a "Relief Association" contract and compliance therewith by both Finn and the company, whereby the latter was released of all liability. Demurrer to this special defense was made that under a special act of the Legislature of South Carolina, entitled "An act to fix and declare the liabilities of any corporation, firm or individual operating a relief department to employés, and to regulate the operation of same," approved March 7, 1905 (24 St. at Large, p. 962), such contract constituted no estoppel to Finn's right to recover. This demurrer was sustained finally by the court below. On March 30, 1911, a verdict was rendered in Finn's favor for $10,000 damages. Motion was made to set aside this verdict and grant a new trial. The court below, after considering this motion, determined that it should be set aside unless a remittitur of one-half the damages was filed within 20 days from the determination of the motion. Such remittitur was filed and judgment was finally entered for $5,000 and costs, to which judgment this writ of error has been sued out.

P. A. Willcox and Lucien W. McLemore, for plaintiff in error.

Thomas B. Fraser and Richard S. Whaley (Miller, Whaley & Bissell, on the briefs), for defendant in error.

Before PRITCHARD, Circuit Judge, and McDOWELL and SMITH, District Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). [1] The first assignment of error is in the following language:

"The said court erred in refusing to direct a verdict at the close of all the evidence in favor of the defendant, for the reason that the evidence, undisputed and indisputable, showed that the plaintiff was a member of the relief department of defendant, and on account of the alleged injury received benefits, and that the acceptance of these benefits constituted a release by the plaintiff in favor of defendant for all alleged damages and constituted a bar to this action; and, further, that the act of the General Assembly of South Carolina, approved March 7, 1905, is unconstitutional, as an unreasonable interference with the right of private contract in contravention of the Constitution of South Carolina (article 1, § 5), and the Constitution of the United States (Amendments, art. 14, § 1), and as impairing the obligation of a contract in contravention of the Constitution of South Carolina (article 1, § 8), and the Constitution of the United States (article 1, § 10); and, further, that defendant became a member of defendant's relief department in 1901, and at such time entered into the contract in question, which cannot be abrogated by the act of the General Assembly approved March 7, 1905."

It is insisted by counsel for the defendant that membership by the plaintiff in the relief department and the acceptance of benefits for injury constitute a release and a bar to this action. The defense relies principally upon the case of Atlantic Coast Line Railroad Company v. Dunning, 166 Fed. 850, 94 C. C. A. 128. That case was heard on writ of error by this court, and the opinion was delivered by Judge Morris and concurred in by Chief Justice Fuller and Judge Purnell. The court, among other things, said:

"There remains to be considered whether the act of South Carolina of March 7, 1905, can have the effect of rendering the contract void by declaring that the acceptance by the employé of the benefits of the contract shall not estop him from recovering damages, notwithstanding he may have given a release; that is to say, that he may accept the benefits of the contract so far as it is beneficial to him, but shall not be bound by the other terms of the contract, which releases the employer. It is to be noted that in the present case the plaintiffs received the sick benefits for over ten months after the accident, and for six months after they had brought their suits.

"The validity of similar legislation has been frequently the subject of judicial adjudication, and the courts have quite uniformly decided adversely to its validity. The act of South Carolina now in question was before the court of common pleas of Charleston county, S. C., in the case of Sturgiss v. Atlantic Coast Line Railroad Company, 80 S. C. 167, 61 S. E. 261, and Circuit Judge Purdy, in a very careful and learned opinion, held that the employé after being injured had a right to elect which remedy he would pursue, and, if he elected to take the benefits and release the railroad company, he was bound by that election, and that the attempt of the Legislature to give him both remedies, notwithstanding his release, was beyond legislative power. And the Circuit Judge also held that the act was an unconstitutional interference with the right of the employé and the railroad company to contract. The Sturgess Case was appealed to the Supreme Court of South Carolina, and was affirmed by a divided court. Sturgiss v. Atlantic Coast Line Railroad Company, 80 S. C. 167, 61 S. E. 261. Also in the circuit court for Charleston county it was held by Circuit Judge Watts that an employé, having elected to receive benefits after the injury, was estopped from bringing an action for damages. This decision on appeal to the Supreme Court of South Carolina was also affirmed by a divided court. Johnson v. Railway Co., 55 S. C. 152, 32 S. E. 2, 33 S. E. 174, 44 L. R. A. 645. We think, therefore, we may take it to have been the law of South Carolina at the time the present case was tried, and, as far as we have any information, now is the law of South Carolina, that whenever an employé has after the accident elected to receive benefits as a member of the relief department, and has released the railroad company, he cannot maintain an action for damages notwithstanding the South Carolina act of assembly."

It will be observed that the decision of the court in that case was based upon the ruling of the South Carolina court to the effect that the act in question was unconstitutional.

The learned judge who tried the case at bar in the court below relied upon the case of McGuire v. Railroad Company, 131 Iowa, 340, 108 N. W. 902, 33 L. R. A. (N. S.) 706. The court in that case in discussing this phase of the question, among other things, said:

"So thoroughly are the courts committed to this theory of the law that in Stewart v. Supervisors [30 Iowa, 9, 1 Am. Rep. 238] supra, it is said that 'a legislative act may be declared unconstitutional only when it violates that instrument clearly, palpably, plainly, and in such manner as to leave no reasonable doubt.' In this same case we approvingly quoted the language of Mr. Justice Baldwin of the federal court as follows: 'We cannot declare a legislative act void because it conflicts with our opinions of policy, expediency or justice. We are not the guardians of the rights of the people of the state,

unless they are secured by some constitutional provision which comes within our judicial cognizance. The remedy for unwise or oppressive legislation within constitutional bounds is by appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but the courts cannot assume their rights.'

"The inquiry to which we are confined is one of legislative power alone. It is fundamental in our system of government that all powers not delegated to the United States by the terms of, the federal Constitution and its amendments, nor prohibited by it to the states, are reserved to the states or to the people. Constitution United States, amend. 10. Subject to the authority thus expressly or by necessary inference delegated to the federal government, the state has sovereign legislative power over all subjects, except such as are withheld from it by the Constitution of the state itself. Boyd v. Ellis, 11 Iowa, 97; Stewart v. Supervisors, 30 Iowa, 9 [1 Am. Rep. 238]; Purczell v. Smidt, 21 Iowa, 540; Morrison v. Springer, 15 Iowa, 324; Boyer v. Kinnick, 90 Iowa, 74, 57 N. W. 691; Hawkeye v. French, 109 Iowa, 588, 80 N. W. 660; New York v. Miln, 36 U. S. 102 (9 L. Ed. 648); Railroad Co. v. Dey, 82 Iowa, 312 [48 N. W. 98, 12 L. R. A. 436, 31 Am. St. Rep. 477]; In re Meador, Fed. Cas. No. 9,375; Wadleigh v. Develling, 1 Ill. App. 596; Moor v. Veazie, 32 Me. 343 (52 Am. Dec. 655); Beyman v. Black, 47 Tex. 558. It is not for the court to inquire or determine whether a state of facts existed calling for the enactment of the legislation in question. That is for the exclusive consideration of the Legislature. If, under any possible state of facts, the act would be constitutional and valid, the court is bound to presume that such condition existed. Munn v. Illinois, 94 U. S. 113 (24 L. Ed. 77): State v. Peckham, 3 R. I. 289; In re Ten Hour Law, 24 R. I. 603, 54 Atl. 602 [61 L. R. A. 612]."

On this point the Supreme Court of Iowa held that the statute declaring invalid any private contract limiting the liability of a railway company for the negligence of a fellow servant is not an arbitrary and unreasonable exercise of the police power of the state. And that the legislative power to create corporations implies power to thereafter prescribe reasonable regulation, even though the right to repeal or amend the charter is not reserved by the state.

The case of McGuire v. Railroad, supra, was carried to the Supreme Court of the United States (219 U. S. 549, 31 Sup. Ct. 259, 55 L. Ed. 328) on a writ of error, and the judgment of the Supreme Court of Iowa was affirmed by that court. The court, in discussing the question, among other things, said:

"The acceptance of benefits is, of course, an act done after the injury, but the legal consequences sought to be attached to that act are derived from the provision in the contract of membership. The stipulation which the statute nullifies is one made in advance of the injury, that the subsequent acceptance of benefits shall constitute full satisfaction of the claim for damages. It is in this respect that the question arises as to the restriction of the liberty of contract. * * * There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity, which consists of the making of contracts, or deny to the government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations, and prohibitions, imposed in the interests of the community."

However, since the decision of the court below and since the argument of the case at bar in this court, this question has again been passed upon by the Supreme Court of South Carolina in the case of James A. Miller v. Atlantic Coast Line Railroad Company, 73 S. E.

71, decided at November term, 1911. In referring to the regulation of the hospital and relief fund, the court, among other things, said:

"Not only do they provide that the employé who has paid his assessments, and thereby contributed to the creation and maintenance of said fund, shall be barred from recovering damages for negligence, if he accepts the benefit thereunder, but they likewise provide that his representatives shall not be allowed to bring an action for damages, caused by the negligence of the corporation, if they accept the benefit of said fund.

"Membership in the hospital and relief fund creates the relation of trustee and cestui que trust between the company and the employé; and, although the employé is assessed to maintain the fund, he is not allowed to receive a dollar of the money collected for that purpose, unless he surrenders his claim for damages, when he has been injured through the negligence of the corporation. The fiduciary relation established between the company and the employé places him practically at the mercy of the corporation; for it is a well-known fact that the employés are not persons, generally, of large means, and frequently are dependent entirely upon their salary or wages for support. What is the condition of the employé when he is injured through the negligence of the company? He realizes the fact that he has a beneficial interest in a trust fund, and, being in need of the money, he is anxious to get it. He is informed, however, that he must surrender all other claims against the corporation. At this time he, perhaps, is suffering great mental and physical pain, his mind is not clear as when in health, and the opportune time contemplated by the corporation has arrived, when he can be easily persuaded to relinquish his claim for damages arising out of negligence. Public policy demands that the corporation shall not have the opportunity of taking advantage of its employés, through the fiduciary relations established between them, with that end in view. We only desire to say, in conclusion, that, if the hospital and relief fund is successfully operated, the practical result will be that the railroad company will be enabled to liquidate claims for damages arising out of its negligence, with sums of money contributed, in the main, by its employés—an indirect way of contracting against its negligence.

"To the same effect is the following language of the court in McGuire v. Railway, 131 Iowa, 340, 108 N. W. 902, 33 L. R. A. (N. S.) 706: 'The average railway employé is not a man of wealth. More often than otherwise, his total possessions, if any, are represented by a modest home, and he depends upon his wages to meet his current living expenses. If he has a family, they, too, are dependent upon his earnings. If severely injured, the pain from his wounds, the anxiety for his dependent family, the pressure of his immediate needs, are not conducive to calm and business-like reflection upon what may prove to be a matter of great importance to him, and those who look to him for support. The immediate aid which the relief department offers may, under such circumstances, assume an exaggerated importance to his eyes, and in his weakness and distress lead him to accept a benefit inferior to that which he might otherwise be entitled to recover. Moreover, the Legislature may well have believed that, while membership in the relief department was entirely voluntary in the legal sense of the word, it was still possible for the employer, by making the tenure of services more secure to those who became members, to bring to bear an influence in that direction, severing of moral coercion.' These views are recognized in the case of Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780, in which the following language is used: 'The Legislature has also recognized the fact, which the experience of legislators in many states has corroborated, that the proprietors of these establishments and their operatives do not stand upon an equality, and that their interests are, to a certain extent, conflicting. The former naturally desire to obtain as much labor as possible from their employés, while the latter are often induced by the fear of discharge to conform to regulations which their judgment, fairly exercised, would pronounce to be detrimental to their health or strength. In other words, the proprietors lay down the rules, and the laborers are practically constrained to obey them. In such case self-interest is often an unsafe guide, and the Legislature may properly interpose its authority. But the fact that both parties are of full

age and competent to contract does not necessarily deprive the state of the power to interfere, where the parties do not stand upon an equality, or where the public health demands that one party to the contract shall be protected against himself. The state still retains an interest in his welfare, however reckless he may be. The whole is no greater than the sum of all the parts, and, when the individual health, safety, and welfare are sacrificed or neglected, the state must suffer.' "

It is also insisted that the act of the Legislature of South Carolina, March 7, 1905, is not applicable here because the contract out of which the release arises was entered into prior to the passage of the act, which cannot operate retroactively, and that, if it is construed to operate retroactively, it is void as impairing the obligation of a contract in contravention of the Constitution of South Carolina (article 1, § 5), and the Constitution of the United States (Amendments, art. 14, § 1).

In the case of Louisville & Nashville Ry. Co. v. Mottley, 219 U. S. 480, 31 Sup. Ct. 265, 55 L. Ed. 297, it appears that as a result of a collision in Kentucky of trains belonging to the Louisville & Nashville Railroad Company, which operates various lines extending through Kentucky, as well as Tennessee and other states, the plaintiffs, Mottley and wife, received serious injuries. Gross negligence of the agents and servants of the railroad was alleged as the cause of the collision. After the collision the plaintiffs and the company on the 2d day of October, 1871, entered into a written agreement of which the following is a copy:

"The Louisville & Nashville Railroad Company in consideration that E. L. Mottley and wife, Annie E. Mottley, have this day released said company from all damages or claims for damages for injuries received by them on the seventh day of September, 1871, in consequence of a collision of trains on the railroad of said company at Randolph's Station, Jefferson county, Ky., hereby agrees to issue free passes on said railroad and branches now existing or to exist, to said E. L. Mottley and Annie E. Mottley for the remainder of the present year and thereafter to renew said passes annually during the lives of said Mottley and wife or either of them."

The railroad company adhered strictly to this agreement for many years, but finally refused further to perform it on the ground that Act Cong. June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1284), amendatory of the act regulating commerce, approved February 4, 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), made its enforcement illegal. The Supreme Court of the United States, in passing upon this question, among other things, said:

"In the Union Bridge Co. Case [204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523], the question was as to the constitutional authority of the government to require the bridge company to make certain changes or alterations in a bridge across a navigable river of the United States, in Pennsylvania, and which bridge the company owned and constantly used. It was admitted that the bridge had been lawfully erected. But ultimately, in view of the necessities of interstate commerce, it had become an unreasonable obstruction to free, open navigation by vessels and boats then in use, and for that reason alone the government, by its constituted authorities proceeding under an act of Congress, ordered the bridge company at its own cost to make certain changes and alterations in the structure. This court held that there was no taking of property for public use in the constitutional sense, and that al-

though the bridge when erected under the authority of Pennsylvania may have been a lawful structure, and although it may not have been an unreasonable obstruction to commerce, as then carried on, 'it must be taken, under the cases cited and upon principle, not only that the company when exerting the power conferred upon it by the state did so with knowledge of the paramount authority of Congress to regulate commerce among the states, but that it erected the bridge subject to the possibility that Congress might, at some future time, when the public interest demanded, exert its power by appropriate legislation to protect navigation against unreasonable obstructions.'

"Long before the above cases were decided it was said in Knox v Lee, 12 Wall. 457, 550, and 551 [20 L. Ed. 287], that 'as in a state of civil society property of a citizen or subject is ownership, subject to the lawful demands of the sovereign, so contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority.' These principles control the decision of the present question. The agreement between the railroad company and the Mottleys must necessarily be regarded as having been made subject to the possibility that at some future time Congress might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable or to impair its value. That the exercise of such power may be hampered or restricted to any extent by contracts previously made between individuals or corporations is inconceivable. The framers of the Constitution never intended any such state of things to exist.

"It is said that, if Congress intended by the commerce act to embrace such a case as this, then the act is repugnant to the Constitution. Does the act infringe upon the constitutional liberty of the citizen to make contracts? Manifestly not. In the Addyston Pipe Case [175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136], above cited, the court said: 'We do not assent to the correctness of the proposition that the constitutional guaranty of liberty to the individual to enter into private contracts limits the power of Congress and prevents it from legislating upon the subject of contracts'—relating to interstate commerce. Again: 'But it has never been and in our opinion ought not to be, held that the word [liberty] included the right of an individual to enter into private contracts upon all subjects, no matter what their nature and wholly irrespective (among other things) of the fact that they would, if performed, result in the regulation of interstate commerce, and in the violation of an act of Congress upon that subject. The provision in the Constitution does not, as we believe, exclude Congress from legislating with regard to contracts of the above nature, while in the exercise of its constitutional right to regulate commerce among the states. * * * Anything which directly obstructs and thus regulates that commerce which is carried on among the states, whether it is state legislation or private contracts between individuals or corporations, should be subject to the power of Congress in the regulation of that commerce.'

"These authorities and principles condemn the proposition that the defendants in error had the constitutional right, pursuant to or because of the agreement of 1871 and during their respective lives, to accept and use free transportation for themselves, as passengers, on an interstate train, after Congress forbade, under penalty any interstate carrier, to demand, collect, or receive compensation for transportation, or any interstate passenger, not within the classes excepted by the act, to use transportation tickets, except upon the basis fixed by the carrier's published schedule of rates. After the commerce act came into effect, no contract that was inconsistent with the regulations established by the act of Congress could be enforced in any court. The rule upon this subject is thoroughly established. * * * We forbear any further citation of authorities. They are numerous, and are all one way. They support the view that, as the contract in question would have been illegal if made after the passage of the commerce act, it cannot now be enforced against the railroad company, even though valid when made. If that principle be not sound, the result would be that individuals and corporations could, by contracts between themselves, in anticipation of legislation, render of no avail the exercise by Congress, to the full extent authorized by the

Constitution, of its power to regulate commerce. No power of Congress can be thus restricted. The mischiefs that would result from a different interpretation of the Constitution will be readily perceived."

This case is quoted with approval by the Supreme Court of South Carolina in the case of Miller v. Railroad Company, supra. That court, in discussing this point, makes the following reference to the case of Railroad Co. v. McGuire, supra:

"The case of McGuire v. Railroad Company, 219 U. S. 549 [31 Sup. Ct. 259, 55 L. Ed. 328], shows that the act of 1905 cannot be construed as an arbitrary exercise of the police power; and that the fact that the contract was made before its passage does not render it inapplicable in this case."

In the case of Washington v. Atlantic Coast Line Railroad Company, and also in the case of Chandler v. Same, reported in 136 Ga. 638, 71 S. E. 1066, the Supreme Court of Georgia holds that the act of the Georgia Legislature, which is similar to the act of the South Carolina Legislature of 1905, does not impair the obligations of a contract either under the state or federal Constitution, and in these cases the McGuire Case and the case of Louisville & Nashville Railroad Company v. Mottley, supra, are cited with approval. The Legislature of South Carolina, in the exercise of its police power, with a view of protecting the rights of her citizens, has seen fit to enact the statute in question. That the Legislature had the right to enact this legislation is undoubtedly true, as shown by the decisions of the highest courts of many of the states as well as the Supreme Court of the United States. And it is obvious that, in the enactment of this statute, it was the intention of the Legislature to promote the welfare of the people of that state, and thereby leave them free and untrammeled in the exercise of their rights as respects contracts of this character.

In view of these decisions, we are of the opinion that the ruling of the lower court to the effect that membership in the relief department is not a bar to the plaintiff's right of recovery was correct.

[2] The last assignment of error relates to the refusal of the lower court to grant the following instruction:

"There is no evidence in this case of negligence on the part of the defendant in failing to exercise ordinary care to have brakes upon the caboose in working order; the evidence otherwise showing that the car was equipped with brakes."

The court below, being of the opinion that there was evidence tending to show negligence on the part of the defendant in failing to exercise ordinary care in maintaining the brakes upon the caboose in working order, ruled that the question as to whether the defendant had exercised ordinary care in this respect was one of fact to be passed upon by the jury. Among other things, the plaintiff, Finn, testified as to this question as follows:

"Q. What happened? A. 1 heard the conductor holloa to the brakeman, 'Why the hell don't you hold that brake? He says, 'I can't hold it, the chain is broke'; and the next breath I heard the conductor holloa to him, 'Change that switch back to the main line.'

"Q. What happened then? A. I got out there, and I felt pretty bad, pretty sore all over, and I sat down in the caboose until I got to Lynchburg. In

order to verify what the negro said about the brake, I got down and looked at the chain myself, and the chain was broken from that standard."

L. K. Tedder, the conductor on the train and a witness on behalf of the plaintiff, testified as follows:

"Q. Was there anything the matter with the caboose car why they could not stop it? A. The chain on the brake staff was broken.

"Q. And that was the reason you could not stop the caboose? A. Yes, sir; when the switchman holloaed to this other brakeman at the brake stand, he said, 'Why don't you hold that shanty car back?' He said, 'How do you expect me to hold it when the chain is broken?'

"Q. Did you see that chain broken any time afterwards? A. Yes, sir; saw it broken at Maysville.

"Q. After the accident? A. After the accident."

The South Carolina statute, which requires the last car of every freight train to be equipped with a good and sufficient brake, is in the following language:

"Sec. 2127. Every railroad corporation shall cause a good and sufficient brake to be attached to every car used upon its railroad for the transportation of passengers, and to every car used for the transportation of freight, except four-wheeled freight cars used only for that purpose; and shall cause to be stationed on every passenger train trusty and skillful brakemen equal in number at least to one for every two cars in the train, except on passenger trains, when power brakes are used, and one such brakeman upon the last car of every freight train, which must always be equipped with a good and sufficient brake." Code of Laws of South Carolina 1902, § 2127.

Inasmuch as there was evidence tending to show that the brake on the last car was out of order and would not work, the question as to whether the brakes on the caboose were in working order was necessarily one of fact to be passed upon by the jury. Under these circumstances, we think that the ruling of the lower court upon this point was eminently proper. For the reasons hereinbefore stated, the judgment of the court below is affirmed.

Affirmed.

McDOWELL, District Judge, concurs in the conclusion reached.