DELANDO PRATT and IMOGENE PRATT, Plaintiffs
in Error,

*vs.*

CHAUNCEY BROWN, Defendant in Error.

ERROR TO THE CIRCUIT COURT OF SAUK COUNTY.

By the act of 1840, commonly called the "Mill Dam Act," the person erecting
a mill dam under the same, and thereby overflowing the land of another, did
not acquire a right to the use of the land so overflowed for that purpose, any
longer than the legislature should see fit to continue the act in operation.

The legislature may delegate the exercise of the right of eminent domain vested
in the sovereignty of the State, to incorporated companies, subject, however, to
the particular restrictions of the constitution.

A charter or act of incorporation of a company with special privileges is in the
nature of a grant, and is a contract within the prohibitory clause of the con-
stitution.

In this State, by the constitution, all special acts of incorporation granted by the
legislature are subject to modification or repeal.

The mill dam law of 1840 was at all times subject to repeal, and the rights of
those holding under it, continued no longer than the act itself, and the right to
overflow the land of another, did not vest in perpetuity in the mill dam owner.

On the repeal of the act of 1840 in relation to mill dams, the parties affected by
the act, were restored to their common law rights and remedies.

The legislature cannot take the private property of one person and give it to an-
other, even upon making compensation.

What are the relative rights of the respective parties, since the repeal of the
mill dam law of 1840, in cases where the owner of the overflowed lands has
proceeded to have his damages assessed, either per annum or in gross, and
such damages have been paid : *Quare ?*

Though the land owner might, if he had chosen, have proceeded to have his
damages assessed in conformity with the law, he was not compelled to do so,
and he lost no right in omitting so to do.

The general "saving clause" of the repealing act in the Revised Statutes, does
not operate to continue the rights or remedies provided by the mill dam act of
1840.

The power of the legislature to pass the mill dam act of 1840, can only be upheld
upon the theory that the lands overflowed by the erection of the mill dam are
required for the "public use," and the mill owner is constituted the medium
through which the government acts in appropriating them ; and when the
act was repealed, the goverdment virtually declared that such lands were no

longer required for public use, and therefore the rights of the parties and their remedies were left as at common law.

The territory of Wisconsin could not exerise the right of eminent domain (if in any case,) over lands owned by the United States, so as to impair the title of the latter thereto, or so as to affect the right of the latter to the primary disposal of the soil.

This was an action of trespass on the case, for flow¯ing lands by means of a mill dam. The action was commenced in the Circuit Court of Sauk county, by the plaintiff in error against the defendant in error. The declaration consisted of four counts. The first was for erecting on the tenth day of April A. D. 1854, a mill dam across the Baraboo river, and for maintaining it from that time to the time of the com¯mencement of the suit; the second was for maintaining the dam for the same time; the third was for erecting and maintaining a part of the dam; the fourth, for maintaining a part of the dam; and concluded to the plaintiffs' damage, five hundred dollars·

To the declaration of the plaintiffs the defendant pleaded the general issue. He also gave notice with his plea that the lands in the declaration mentioned, was overflowed before the plaintiffs became possessed of them, and that they took them subject to the defendant's right to overflow them; that the dam was erected and the said lands overflowed whilst they belonged to the government, and that the said dam was erected with the license of the plaintiff, Delando Pratt, and that one Philemon Pratt, whilst the owner of the tract, also gave license to the defendant to erect and maintain the said dam.

On these pleadings the cause was tried at the April term of the Circuit Court, before the judge thereof, a jury being waived, which resulted in a judgment for the defendant.

On the trial it was proved that Imogene Pratt, the wife of Delando Pratt, was seized in fee of the premises mentioned in the declaration, and had been so seized since the 10th of April, 1851. That the said dam causes the water to flow a portion of the land described in the declaration; that it was maintained by the defendant in error, and had been since April 10, 1851; that the land flowed is good land; that about a year previously, the said dam was carried away, and when so down the lands were not flowed. That the said Brown re-built the dam, which caused the lands to be again overflowed; that the amount of land flowed was about eight acres and sixteen hundredths, and the value thereof was thirty or forty dollars per acre, and the use of it per annum two dollars per acre; that the said Brown was forbidden to raise the dam so as to overflow the lands, but that he did so raise the same, and the lands were thereby overflowed.

On the part of the defendant it was proved that the Baraboo river is not a navigable stream at the place where the dam is located; that George W. Brown erected said dam in 1844, and that the defendant in error, Imogene Pratt, was the heir at law of the premises, and has owned and possessed the same since 1847. It was also contended by the defendant in error, that an action at law for flowing lands will not lie in this case, as the proof showed that the dam was erected under the mill dam law of 1840.

Upon the evidence so offered, the circuit judge rendered a judgment for the defendant in error, and the cause is brought to this court upon writ of error.

*D. J. Pulling and A. L. Collins,* for the plaintiff in error.

*E. G. Ryan and H. Knowlton,* for the defendant in error.

*By the Court,* Smith, J. The importance of the main principles involved in this case, and the differences of opinion that exist in reference to their application and extent, have induced an anxious and laborious consideration. The results of our deliberations we will now proceed to give, and leave the responsibility for the consequences where they properly belong, to the legislatures which enacted and repealed the law out of which the difficulties have arisen.

In 1840, the Territorial legislature enacted what is commonly called the "Mill Dam Act," the provisions of which are well understood.

At the term of January, 1849, of the Supreme Court, in the case of *Newcomb vs. Smith,* 1 *Chandler,* 71, the constitutionality of the act was brought in question, elaborately argued on both sides, and profoundly considered by the court. A majority of the court held the act not repugnant, either to the Constitution of the United States, or to the ordinance of 1787 for the government of the territory northwest of the Ohio river, and a very able opinion was pronounced sustaining this view. A minority of the court held the contrary, that the act was repugnant to the Constitution of the United States, and to the ordinance of 1787 aforesaid, and sustained this position in an opinion exhibiting deep research, and great power of reasoning.

The legislature of the State, at the session of 1849, passed an act repealing the act of 1840, to take effect

the second day of January, 1850, and made no special

provision for securing or indemnifying the persons whose property had been invested or affected under that act. It had been in operation ten years, and a large amount of capital, it is fair to presume, had been employed in the erection of mills and mill dams, and a large amount of property taken and appropriated for that purpose, and it is remarkable that the legislature, in repealing the law, should have failed to provide for the interest which had already accrued under it. The only attempt to accomplish such purpose, (if, indeed, it can be so called,) is to be found in the general "saving clause," found in the Revised Statutes, chapter 157, entitled, "Of the taking effect, repeal and publication of certain acts."

It is proper here to remark, that at the session of 1849 the Revised Statutes were enacted, and all or nearly all of the statutes before existing were repealed. The repeal was made by reference to the several acts by their title, date, &c., and the second section of the same chapter provides as follows : "The repeal of the acts mentioned in the preceding section, shall not affect any act done, or right accrued or established, or any proceeding, suit or prosecution had or commenced in any civil case previous to the time when such repeal shall take effect; but every such act, right and proceeding, shall remain as valid and effectual as if the provision so repealed had remained in force." It is more than probable, that had the repeal of the act of 1840 been the only subject of legislation at the time, provisions more adequate to the emergency would have been made. Be that as it may, we must take the legislation on this subject

as we find it, and pass upon the rights of the parties as the statutes have fixed them.

Such is the history, legislative and judicial, of the mill dam law, from its enactment in 1840, up to the time of its repeal, in 1850.

We do not propose now to enter into a discussion of the constitutionality of the act of 1840. It no longer exists, and its mischiefs and its blessings are alike ended. The Supreme Court of this State once pronounced it constitutional before its repeal, and it would be now worse than idle to call in question the correctness of that decision.

But there are questions yet remaining, as regards the nature and extent of the rights acquired during its existence, and the remedies to protect and enforce them, of the utmost consequence, some of which, at least, are involved in the case now before us, and which it becomes our duty now to settle.

On the part of the defendant in error, it is contended, "that the repeal of the act in 1850 cannot affect the question in this case. If the act of 1840 be constitutional, the ancestor of the defendant in error acquired a vested right to maintain his dam, and that right was not impaired by the repeal. He has therefore a right to maintain his dam, whereas this action proceeds upon the illegality of the dam and its maintenance. The dam cannot be held to be legally maintained in favor of the right of the defendant in error, and illegally maintained in favor of the right of the compensation of the plaintiff in error; that it is a right in perpetuity, to overflow the land of the plaintiff; that this right vested in the defendant, under the act, as an easement, or incorporeal

hereditament, appurtenant to the maintenance of the dam, in perpetuity."

It is necessary to examine these propositions carefully, for if they are correct in law, the case is undoubtedly with the defendant in error. Is it true, that "if the act of 1840 be constitutional, the ancestor of the defendant in error acquired a vested right to maintain his dam, and that that right was not affected by the repeal"?

These and kindred propositions were presented to the Supreme Court under its former organization, in the case of *Stevens vs. Marshall*, 3 *Chand.* 222, and that case is strongly urged upon us to induce us to concur therein, for it cannot be denied that a majority of the court did hold in conformity with the propositions here insisted upon. As, however, these are questions affecting not merely the routine of practice, nor rights determined by the lapse of time, or palpable legislative enactment, we do not feel at liberty as we would wish, to throw ourselves back upon that decision, and thus evade further responsibility. It is true that when a principle of law, doubtful in its character, or uncertain in the subject matter of its application, has been settled by a series of judicial decisions, and acquiesced in for a considerable time, and important rights and interests have become established under such decisions, courts will hesitate long before they will attempt to overturn the result so long established. So when it is apparently indifferent, which of two or more rules is adopted, which one shall have been adopted by judicial sanction, it will be adhered to, though it may not, at the moment, appear to be the preferable rule. But when a question arises involving important private or public

40

rights, extending through all coming time, has been passed upon on a single occasion, and which decision can in no just sense be said to have been acquiesced in, it is not only the right, but the duty of the court, when properly called upon, to re-examine the questions involved, and again subject them to judicial scrutiny. We are by no means unmindful of the salutary tendency of the rule *stare decisis*, but at the same time we cannot be unmindful of the lessons furnished by our own consciousness, as well as by judicial history, of the liability to error, and the advantages of review.

We therefore enter upon the discussion of the questions involved in this case, not for the purpose of again re-opening the subject matter thereof to criticism or investigation, but for the purpose of discharging our full duty in the premises.

Is it true, then, that if the act of 1840 be constitutional, the ancestor of the defendant in error acquired a vested right to maintain his dam, and to overflow the land of the plaintiff; that he thereby acquired an incorporeal hereditament in the plaintiff's land, which rights were not affected by the repeal of the said act?

The answer of this question will be decisive of the case before us, for this is the main question involved. The time has gone by, when it is proper to discuss or question, judicially, the power of the legislature to exercise the right of eminent domain resting in the sovereignty of the State, by delegation to incorporated companies. However powerful may heretofore have been the adverse array of logical argument, the suggestions of cautious expediency, or the jealousy of personal rights, it has long since yielded to the irre-

sistible tide of progressive improvement, and been lost in the wake of judicial authority.

In all the instances, however, in which this power, to take private property for public use, has been delegated to corporations, the parties interested in such grant have been compelled to rely, for the perpetuity of the grant, either upon the pledged faith of the sovereign power making the grant, or upon constitutional compacts inhibiting the power of revocation. The doctrine that a charter of incorporation, conferring certain franchises upon a company or individual, was in the nature of a grant, and hence protected from encroachment or attack by the shield of the federal constitution, which prohibits the States from passing any laws impairing the obligation of contracts, was established, after elaborate argument and on full consideration, by the Supreme Court of the United States in the Dartmouth College case. This doctrine has, since that decision, been generally acquiesced in by nearly, if not quite all the State Courts of the Union. It is competent, nevertheless, for each State, by constitutional regulation, or specific legislative enactment, to reserve the power to modify or repeal all such acts of incorporation.

Where the power of modification or repeal is reserved, either in the one mode or the other, it is obvious that the grantees must rely, for the perpetuity and integrity of the franchises granted to them, solely upon the faith of the sovereign grantor. Hence since the decision of the Dartmouth College case, some of the States, and our own among the number, have by constitutional provision reserved to their legislatures the right of modification or repeal of all special acts of incorporation, and all such corporations now rest

upon the faith of the State, taking care to deserve its favor, or command its justice, by observing strictly the limit of their powers, and accomplishing by all legitimate means the objects of their creation.

The incorporation of companies for the purpose of constructing railroads or canals, affords the best illustration of the delegation of the power to exercise the right of eminent domain by the condemnation and seizure of private property for public use, upon making just compensation therefor. It is admitted that the only principle upon which such delegation of power can be justified, is, that the property taken by these companies, is taken for the public use. No one has yet advanced the doctrine, that the legislature can exercise the right of eminent domain in the taking of private property of one person and giving it to another private person, even upon full compensation, unless the public use require it. It is not the company as an association of individuals who take the property for their own use, but it is the sovereign power that takes it, through the agency of the corporation, for the public use. This is the theory upon which the seizure and use of private property for such purposes, and by such agencies, is, or can be justified. We are by no means disposed to deny, or even question its soundness.

But is it not obvious, that such corporations may hold and exercise such power only at the will of the legislature, circumscribed either by the fundamental law, or by the particular act of incorporation? Sometimes the grant of such franchises is in perpetuity; sometimes for a given number of years, and sometimes during the pleasure of the sovereign grantor. But by whatever mode, or at whatever time, the fran-

chise is determinable, it is nevertheless dependent upon the sovereign power, and is determinable at its will constitutionally expressed. While the corporate existence and its franchises remain, all acts done in conformity therewith, are lawful, but on their extinction, either by lapse of time, or by the sovereign mandate, the acts which were before lawful become unlawful, and the powers and franchises are resumed by the government. The latter in effect declares that the public good or necessity no longer requires the exercise of these powers, and the agency of the corporation through which they have been exercised is henceforth dispensed with.

The fundamental principle upon which the constitutionality of the mill dam act is sustained, is essentially similar, however different may be its mode of accomplishing the desired result. The theory is that the property of the person whose land is overflowed, is taken for the "public use" through the exercise of the right of eminent domain vested in the government. Upon no other theory or principle can the law be upheld for a moment. Upon no other is, or has it ever been attempted to be sustained. The legislature in 1840 said to the individual owning land on which there was a mill site, "If you will erect a mill thereon, and a dam to raise water for working it, you are at liberty to do so, and the government will take and hold by its right of eminent domain, whatever land belonging to other persons, it may become necessary to overflow for such purpose." "We have not the power to authorize you to take the property of your neighbor and convert it to your own use, even though you pay him what our tribunals may deem a reasonable compensation, but we have the

right to take it for the "*public use*," on providing for compensation. We will therefore call the use of it the public use, through you as our agent, and you may seize and use it in behalf of the public." The citizen thus addressed, might well reply, "suppose I invest my money and means in such erections, build my mill and put it in operation; by what tenure do I hold the privileges offered me? How long may I use my neighbor's property, and the government continue to call it the "public use?" Or, how long will the government hold my neighbor's land for me by virtue of its right of eminent domain, in this manner devoting it to the public use?" These would be pertinent and prudential inquiries, which would scarcely be overlooked in private transactions of a similar nature. Here is no act of incorporation declaring the duration of the powers and privileges conferred. Here is no delegation of the right of eminent domain, for it cannot be delegated to private persons for private purposes. But the whole theory is, that the government takes the land and holds it for the public use; for if the taking, the holding and the use be once admitted to be private, the whole fabric of justification crumbles to pieces. It is the continuous exercise of the sovereign power condemning and appropriating the private property of the individual to the public use. The mill owner is the mere medium through whom the government acts. His acts in the premises are the acts of the government, and they are none the less so, because the law provides a mode of indemnity or compensation to the citizen whose property is taken.

What, then, are the rights of the mill owner, and whence are they derived? As yet he has derived no

rights from any act of the individual whose property June Term. 1854.
the public has taken and is using through him, for no
act has been done by the land owner. All that the Pratt vs. Brown.
mill owner has derived from the government is, to
operate as a mere tractile instrument in the hands of
the government, and operating at its will. The gov-
ernment has not even intimated to him how long it
will employ him for such purpose ; or, in other words,
how long his holding and use of the property of an-
other shall be called and adjudged a public holding,
and a public use. It is clear, therefore, that he is
solely dependent for the duration of the privilege,
upon the will of the government. So long as the
legislature shall continue to call the taking and hold-
ing a public use, by continuing the law in force, so long
the mill owner is protected in the acts done by him
under the law. But whenever the government declares
that it will no longer seize and hold such lands for the
public use, the occupancy of them by the mill owner
becomes a private use and no longer within the pro-
tection of the constitution and the law. This the le-
gislature does declare by a repeal of the act. All
that the mill owner can afterwards claim is immuni-
ty for acts done, and protection in the exercise of the
rights which the law conferred during its continu-
ance in force. As no time was fixed by the act con-
ferring these privileges upon the mill owner, pre-
scribing their duration, no rights of the kind here
brought in question, could vest in him, extending be-
yond the duration of the law. As the law was re-
pealable in its nature, the power of repeal remaining
in the legislature, whoever availed himself of the
privileges conferred by it, took the same subject to
such right of repeal. The risk was one of his own

incurring, and if the legislature has availed itself of this undoubted power of repeal sooner than the mill owner anticipated, it is his misfortune, from which judicial interference cannot relieve him, but his recourse, if any he has, is to the same power under whose sanction he invested his money. In 1840 the legislature declared that lands of the description of those now in question, were necessary for the public use, and the "public" took and used the plaintiffs' land through the medium or instrumentality of the defendant. In 1850 the legislature declared, by the repeal of the act, that this land was no longer wanted for the public use, and dispensed with the further agency of the defendant in their appropriation. Rights may indeed have vested, but not in perpetuity, by virtue of the law, and the acts of the defendant. They remained perfectly secure so long as the government chose to continue in exercise its right of eminent domain in that behalf.

In all the foregoing remarks, no reference has been had to cases in which the person whose lands have been taken under the law, has proceeded to have his damages assessed, and received his compensation. Whether such proceeding on his part would be construed into an assent, and assume the character of a contract which after legislation could not impair, we do not pretend to say. That question is not now before us. The consequences of the land owner accepting the gross sum, or the annual compensation assessed by the jury, are not now the subject of inquiry, for the reason that the plaintiffs in this case, nor their grantors, have ever taken any measures to have their damages assessed, nor, so far as appears in the record, done any act from which their assent to the

JUNE TERM
1854.

Pratt
vs.
Brown.

flowing of their land can be implied. The defendant stands here, upon the naked authority which he claims to have derived by operation of law. We look upon his position precisely as though the government had appropriated the land of the plaintiffs during its pleasure, and constituted the defendant the occupier during the same period. Undoubtedly he had a vested right to the occupancy of the land, as long as the government should see fit to continue its appropriation, and no longer. The effect of the enacting and repealing statutes is, that the government, through the agency of the mill owner, held the lands liable to seizure and appropriation for the period of ten years, or until the second day of January, 1850. From that time the public use ceased, and if the mill owner desired further occupancy, he must derive his right thereto from contract with the owner, and not through the sovereign right of eminent domain.

We are not disposed to question the proposition, that the right of the land owner to compensation accrues upon the taking of his land, and that he might, if he chose, have proceeded under the law. But he was not compelled to do so. He might well decline to do any act from which his assent to the taking of his land might be implied.

Assuming, therefore, as we have done all along, that the mill dam law of 1840 was constitutional during its continuance, it is apparent to us, that neither by its terms nor its legal effect, did it operate to vest any right in the mill owner in perpetuity. That such rights as were conferred thereby were continuous only with the act, and ceased upon its repeal, unless saved and perpetuated by express provision. Any other construction would involve the assertion of

June Term
1854.

Pratt
vs.
Brown.

legislative power over private property never before intimated, namely: the power to appropriate the private property of one individual to the private use of another, upon making compensation.

It is needless to pursue this subject further. It will be seen that our views of the law are utterly irreconcilable with those of the majority of the court in *Stephens vs. Marshall*. It is to be regretted that the legislature did not provide, upon the repeal of the law of 1840, for cases of this kind, and others that may hereafter arise. But we are not answerable for the results, and must leave the subject to the wisdom of the law making power.

It will be perceived that the general "saving clause," before cited, equally applicable to all the statutes repealed by chapter 157 of the Revised Statutes, cannot, in our opinion, and consistently with the views herein expressed, accomplish the objects which are sought to be brought within the purview of its operation.

The evidence in this case shows that the mill dam of the defendant was carried away in the year 1853; that soon after the defendant rebuilt it, against the protest of the plaintiff. Long before the defendant attempted to rebuild his dam, the government had ceased to require the plaintiff's land for public use. It will not be denied, that in case the defendant had abandoned his enterprise, and neglected to replace the dam, the land theretofore overflowed would have reverted to the use of the plaintiffs. How long could the defendant rest without resuming his pretended franchise? When would the right re-vest in the plaintiffs? Was there not a fresh taking upon rebuilding the dam? By what authority, if any, was

the re-taking justified? What right had the defend-
ant to take the land, after the public use was aban-
doned by the sovereign authority? What remedy
had the plaintiffs for compensation, after the remedy
provided by the act of 1840 was repealed? Though
the *right* were saved to him, where was his remedy?
These and similar questions may well admonish us of
the danger of interference with private property, and
the necessity of rendering efficient all the safeguards
which the law has provided for its protection.

But it is contended, that as this land was already
overflowed at the time the plaintiffs acquired title
thereto, they took subject to that incumbrance or
easement, and hence cannot maintain this action.

The bill of exceptions states that the plaintiffs were
seized of the lands in 1851, that the dam was erected
before that time, (1844) by George W. Brown, the
ancestor of the defendant, who died in 1847, and that
the defendant is his heir at law, and has owned and
possessed the dam ever since. It does not appear
from whom Imogene Pratt, the wife of the plaintiff
Delando, derived titles, but the notice accompanying
the plea of the defendant, states that the lands were
overflowed before the plaintiffs became posseesed of
them ; that they took them subject to the defend-
ant's right to flow them ; that the dam was erected
and the lands overflowed while they belonged to the
government of the United States, and the dam was
erected with the license of Delando Pratt, and that
Philemon Pratt, while owner of the tract, also gave
license, &c. But none of these matters appeared in
proof, except that the dam was first erected in 1844,
previous to the date of the seizin of the plaintiffs.

It will hardly be seriously contended that the ter-

ritory of Wisconsin could exercise the right, of eminent domain over lands belonging to the United States so as to impair the title of the latter, or that the primary disposal of the soil by the latter could be hampered by the assumption of any claim derived from such authority. But it is useless to pursue this branch of the inquiry. Our construction of the law, and the rights of the parties under it is hostile to the position assumed, and of course it cannot avail the defendant.

Other questions were raised on the argument, and many others were suggested by an investigation of the principles involved, which it would be interesting to discuss at length, but as the conclusions to which we have arrived, and which we have already announced are believed to be decisive of the legal rights of the parties, we forbear any further comments.

The judgment of the Circuit Court is reversed, and the cause remanded, with directions to the Circuit Court to proceed therein according to law.