Dickman, J.
The Cincinnati Inclined Plane Railway Company was incorporated in the year 1871, under the act of May 1,1852, entitled, “ An act to provide for the creation and regulation of incorporated companies in the state of *420 Ohio.” On March 30,1877, the legislature passed an act authorizing any inclined plane railway or railroad company theretofore or thereafter organized under the act of 1852, to hold, lease, or purchase, and maintain and operate such portion of any street railroad leading to or connected with the inclined plane as might be necessary for the convenient dispatch of its business, upon the same terms and conditions on which it held, maintained, and operated its inclined plane; “ provided, that no other motive power than animals shall be used on the public highways occupied by such street railway company without the consent of the board of public works in any city having such board, and the common council, or the public authority or company having charge, or owning any other highway in which such street railroad may be laid.”
In September, 1885, the Cincinnati Board of Public "Works adopted a resolution, consenting “ to the use either of electricity, cable or compressed air, as a motive power by The Cincinnati Inclined Plane Railway Company upon the highways in which the street railroads, connected with its inclined plane, and held and operated by it, are laid.” In October, 1888, the railway company, setting forth the resolution giving such consent, and stating that it had decided to use electricity as a motive power on its road, made application to the board of public affairs — the legally constituted successor of the board of public works — for permission to erect along the entire length of its road the poles, wires, and other appliances necessary to operate and maintain its entire line from Fifth and Walnut streets to the Zoological Garden, as an electric road. And thereupon, the board of public affairs, acting under authority of the act of March 30, 1877, and in furtherance of the grant made by the board of public works, granted the application of the railway company, upon the following condition: “ 1st. The poles to be made of iron of "the size and pattern, and the wires to be strung in the manner as shown on the plan submitted to this board, and hereby approved.”
In February, 1889, in accordance with the provisions of *421 section 3306 of the Revised Statutes, the stockholders of the railway company extended the northern terminus of its road at the Zoological Garden to the village of Glendale. And in March, 1889, the Board of County Commissioners of Hamilton county, by resolution, granted the application of the Railway Company to use and occupy the Carthage turnpike to its northern terminus, by double tracks, and with necessary appendages and appurtenances of an overhead electric railroad system, so as to enable the company to permit continuous, rapid, and safe transportation between Fountain Square in Cincinnati and the village of Carthage. A provision in the grant provided for the removal by the county commissioners, of any and all telegraph and telephone poles which might interfere with the operation of the electric road. This provision, however, was afterwards modified by the action of the commissioners, so as to locate the telegraph and telephone poles at the curb line.
The plan submitted to and approved by the board of public affairs is known as the “ Sprague Single Trolley Overhead System.” Under the supervision of the engineer of the board, the poles were erected and wires strung; —and about the beginning of June, 1889, the Railway Company had put its street railway in operation under that system, as far as the Zoological Garden; and at the commencement of the original action, was engaged in constructing its extension along the Carthage pike under the grant of the county commissioners, with the necessary appendages and appurtenances of the single trolley system.
In the Sprague System, the electricity used to operate the motors under the cars, is conveyed to them by a single overhead trolley wire, and a single arm or pole attached to the car, and carrying a contact wheel which runs along and presses up underneath the trolley wire. The current passes down the pole or arm to the switch apparatus on board the car, through the motors, thence to the wheels and to the tracks. It then passes back to the station along the iron rails of the track interlaced together by conducting wires, and finally connected by a conducting wire with the negative *422 pole of the dynamo, the greater portion of the current flowing along this line of the track as the return current. Some portions of such current, however, are unavoidably diverted through whatever conductors are in proximity and which themselves have grounded circuits, but generally returning to the source in which it originated, by means of the metallic ground connection of the rails as extended by the wire to the dynamo.
The single trolley system is in use on nine tenths of the railroads in the United States using electricity. As compared with the double trolley method, it is deemed more simple, less liable to disarrangement, much cheaper, and not liable to accidents which would blockade the cars. It has proved successful, and its general adoption, with full knowledge of the double trolley method, furnishes strong proof that it is the most approved system. And, in the finding of facts by the court at general term, there is nothing in disparagement of the single trolley system in itself, but it is held objectionable because it includes the grounded circuit, which the defendant in error has adopted, and claims a monopoly of its use as against the Railway Company, as an essential part of its telephonic system.
It is evident, therefore, that the Railway Company derived from the legislature the right to use on its road other motive power than animals ; that it acquired the franchise of using electro-motive power; and eliminating from view the Telegraph Association, it is making lawful use of such franchise, in a manner authorized by the statute.
The City and Suburban Telegraph Association was incorporated July 1, 1873, as a telegraph company, with lines extending from Cincinnati to Hamilton, in Butler county, under laws since embodied in the chapter of the Revised Statutes, regulating “ Magnetic Telegraph Companies,” and containing section 3454, which provides: “ A magnetic telegraph company heretofore or hereafter created may construct telegraph lines, from point to point, along and upon any public road, by the erection of the necessary fixtures, including posts, piers, and abutments necessary for the wires; but *423 the same shall not incommode the public in the use of such road.”
In 1878, the Telegraph Association became the licensee' of The American Bell Telephone Company, with the exclusive right to use all its patents in Cincinnati and certain territory adjacent thereto, and although organized as a telegraph company, entered upon the business of a telephone company. After obtaining the license to use the telephone, the Telegraph Association erected poles and wires upon the streets wherein the railway of the plaintiff in error is situated, and which was then being operated as a horse railway. These poles and wires were mainly erected in the years 1881 and 1882. But prior thereto, in 1880, the following section was added to the telegraph law: “ Section 8471. The provisions of this chapter shall apply also to any company organized to construct any line or lines of telephone; and every such company shall have the same powers and be subject to the same restrictions, as are herein prescribed for magnetic telegraph companies.” But, without this section making the provisions of the chapter relating to telegraph companies expressly applicable to telephone companies, we think that the term “ telegraph,” as a mode of transmitting messages or other communications, is sufficiently comprehensive to embrace the telephone.
It is thus apparent, that while the Telegraph Association was organized after the incorporation of the Railway Company, it had planted its poles, and strung its wires, and entered upon the business of a telephone company before the Railway Company had put its street railway into operation with electricity as the motive power; that permission, in due form of law, was granted to the Telegraph Association to place and maintain its poles and wires for the purpose of supplying telephonic communication to its subscribers in Cincinnati and vicinity, and also as a means of communication for its longer lines.
But, it is urged, that the franchise of the Telegraph Association to construct lines of telephone is greatly impaired by reason of the single trolley railway using a grounded *424 circuit, whereby, a large part of the electric current flows off from the rails to the surrounding earth, and to and upon all telephone wires which may be connected with the earth in proximity to the railway. The action is described as conduction, causing more or less of electric current to be poured into the earth and into all electric conductors connected with the earth, thereby reaching telephone wires in a grounded circuit, and creating loud and continuous noises upon the wires, which disturb telephonic communication. This disturbance, however, results not solely from the earth circuit of the Railway Company, but also from the fact, that the defendant in error likewise relies upon the earth for its return circuit, by connecting with the earth the end of its wire furthest from its electric batteries. The telephone wires are carried from the phones of subscribers to the gas pipes in the rooms wheré the phones are located, or to water pipes, or to the earth, in order to make a complete circuit. The interference, moreover, with the operation of the telephone, is said to be largely attributable to the delicate mechanism of the telephone wires and phones. The wires, being designed to carry the extremely small current needed for telephone transmission, are too small in size to carry successfully the strong current passing into them from electric railways.
It is claimed, that in addition to this conduction or leakage disturbance, the single trolley electric railway introduces serious disturbances on telephone lines by induction, for the reason, that such electric railways employ large wires to convey the current used for the propulsion of their cars, and this current is constantly and rapidly changing its strength ; that these rapidly changing currents in the electric railway wires induce disturbing currents in parallel telephone wires near which the electric railways have been built, and thus prevent a successful transmission of telephonic messages.
These interferences with the telephone service may be obviated, it is stated, by the Railway Company giving up the single trolley system with the ground circuit, and substituting the double trolley system with its two trolley wires, two *425 trolley wheels, and electric current passing from one wire through one trolley, through the motor, back through the other trolley to the other wire, and so back to the generator, without escaping to the earth. The grounded circuit, it is insisted, should be abandoned and surrendered to the sole use and service of the defendant in error. But, it is admitted, that other remedies of the telephone disturbances may be easily obtained by constructing the telephone with a complete metallic circuit, or by resort to what is known as the McCluer device, consisting of a single return wire, to which a number of telephone wires are attached.
Conceding that the mode adopted by the Railway Company of propelling its cars by electricity is an interruption to the telephone service of the defendant in error, and calculated to impair its franchise in the manner contended, the inquiry is suggested, whether the Railway Company must yield up a useful franchise that the same may be exclusively enjoyed by the Telegraph Association, or whether the Association shall adapt its system to existing- conditions; whether the Company shall change from the single to the double trolley system, from the grounded to the metallic circuit, or whether the Association shall use either a complete metallic circuit, or resort to the McCluer device. It is immaterial on which party the expense of the change may fall the more heavily. It is a question of legal right, and'as remarked by Lord Hatherly, L. C., in Attorney-General v. Colney Hatch Lunatic Asylum, 4 L. R. Ch. Ap. 153, “ the simplest course, as far as regards the administration of justice, is to ascertain-the exact state of the law which regulates the relations of the parties; and, having done so, to proceed to act on it, without any reference to the difficulties of the case on the part of those against whom it is obliged to decide; leaving those parties to relieve themselves as they best can from the position in which they have placed themselves, and if there be no other mode of escape, to cease to do the acts which occasion the wrong.”
When the Telegraph Association erected its poles and lines in 1881 and 1882, with the design' of conducting the *426 business o£ a telephone company, it found the Railway Company operating its street railway with authority under the Statute to use other motive power than animals, to wit, electricity, cable, or compressed air, upon obtaining the consent of the board of public works. The telephone business was not among the probabilities when the streets of Cincinnati, now made use of by the Telegraph Association, were dedicated or condemned for the public use. The primary aud dominant purpose of their establishment was to facilitate travel and transportation; they belong from side to side and end to end to the public, that the public may enjoy the right of traveling and transporting their goods over them. The telephone poles, and wires, and other appliances, are not among the original and primary objects for which streets are opened, for, they may be placed elsewhere than on the highways, and yet accomplish their purpose. In Taggart v. Street Railway Company, 16 R. I. 668, it was said by Dttkeee, C. J., that telephone poles and wires are not used to facilitate the use of the streets for travel and transportation; “ whereas, the poles and wires of the railway company are directly ancillary to the uses of the streets as such, in that they communicate the power by which the street cars are propelled.” As a general rule, an occupation of the streets otherwise than for travel and transportation, is presumptively inferior and subservient to the dominant easement of the public for highway purposes, for if not so, the primary object of their dedication or appropriation might be largely defeated. And, the fact that permission is granted to occupy the streets or highways for a purpose other than travel, does not confer a prior and paramount right to occupy them to the exclusion of their use for travel in a mode different from what obtained when such permission was given.
The main purpose of streets or highways being to facilitate travel and transportation, new and improved agencies for effecting that purpose must be presumed to have been in contemplation, in addition to those in existence when the ways were established. To those improved agencies, devised for the convenience and advantage of the community *427 iu general, the franchise of the telephone company to occupy the streets for carrying on its business, must be secondary and subordinate. “ The use of a highway for the purposes of a street railroad, involves the application of new appliances and modes of travel, rather than,of any new principle. In both; a corporation is employed and invested with rights in the highway; in both, an expenditure of money is required to put the road in a condition for use and to keep it in repair; but in both, the great leading object and public benefit is the accommodation of travelers, who may have occasion to use them at fixed tolls or rates of fare, and not the profit of the proprietors.” Ranney, J., in Street Railway v. Cumminsville, 14 Ohio St. 523, 545.
In the case Hudson River Telephone Company v. The Watervliet Turnpike and Railroad Company, 121 N. Y. 397, the right of the telephone company to enjoin the railroad company from operating its road by electricity under- the single trolley system, incidentally came under consideration. In delivering the opinion of the court, Andrews, J., after-stating that the use of a grounded circuit is not necessary to a telephone system, and that the substitution of the metallic for the earth circuit, besides obviating the disturbance caused by the defendant’s road, would promote the general efficiency of the telephone service, says: “ The plaintiff is but one of a large number of telephone companies which, under the general permission of the statute for the incorporation of telegraph companies, have erected poles and strung their wires in the streets of the cities and villages of the state. The claim that under this permissory grant they can exclude the use of the streets by electric railways, or for other street purposes requiring the use of electricity wherever the use of this agent interferes with the use of the telephone, although the municipality may consent and the public interest will be promoted by the other uses to which the streets are sought to be subjected, needs but to be stated to induce hesitation.” In the last entitled case, the telephone company erected poles for its wires, and perfected its system of telephone communication, several years before the railroad *428 company substituted electricity in place of horse power for the movement of its cars.
The authority given by statute to a telephone company to construct its lines from point to point, along and upon any public road, under the continuing prohibition that, “ the same shall not incommode the public in the use of such road,” would plainly indicate an intention on the part of the legislature that the company shall exercise such franchise with reference to the comfort and convenience of the traveling public, and shall not, in any manner, abridge or impair the use, by the public, of the most approved methods of travel and transportation. And a reasonable interpretation of the statute would lead to the conclusion, that to impair the public enjoyment of an approved method of conveyance on the streets, would be in derogation of the statutory prohibition that the public shall not be incommoded in the use of the roads or highways.
The statutory permission to the Telegraph Association to construct its telephone lines along and upon the highways, was not, therefore, without qualification. But, whether the legislature had or had not imposed the condition, that the-public should not be incommoded, the Association, in our, judgment, acquired its privilege or permissory grant, subject to the duty of so changing and adjusting, when necessary, its system of operating its telephone lines, as not to curtail the enjoyment by the public of the best inodes of travel and. transportation upon the streets. Whether all who go on the streets shall have the most convenient and expeditious passage and carriage of person and goods, has not been made dependent upon the manner in which the defendant in error-has preferred to locate its poles, stretch its telephone wires, or form the electric circuit.-
It is in recognition and maintenance of the superior easement of the public in the streets, that city councils are re-, quired to “ cause the same to be kept open and in repair, and free from nuisance; ” that the streets are graded and paved, and proper regulations of police provided to govern the actions of persons using them; that the abutting owner, though *429 having a peculiar interest and easement in the adjacent street, appendant to his lot, has no right to place permanent obstructions in the street, or do any act on his own land, outside the limits of the street, that will make the way inconvenient or hazardous, or less secure than it was left by the municipal authorities. Crawford v. Delaware, 7 Ohio St. 459; Elliott on Roads, 311; Mallory v. Griffey, 85 Penn. St. 275; Milburn v. Fowler, 27 Hun, (N. Y.,) 568; Dillon’s Mun. Cor. § 1032, and cases there cited.
In The King v. Russell, 6 East, 427, the right of the owner to load and unload his wagons in the highway before his. warehouse, was held to be entirely subordinate to the right of public passage, and must not be exercised in such a manner as unreasonably to abridge or incommode the latter right. The court say: “ The primary object of the street was for the free passage of the public, and anything which impeded that free passage, without necessity, was a nuisance. If the nature of the defendant’s business were such as to require the loading and unloading of so many more of his wagons than could conveniently be contained within his own private premises, he must either enlarge his premises, or remove his business to some more convenient spot.” As against the public easement in the highway, a telephone company that obtains the naked permission to locate its poles and wires along the streets, should, we think, stand on no higher vantage ground than the owners of property abutting on the streets, who hold or acquire their property subject to all the consequences which may result, advantageously or otherwise, from any public and authorized use of the streets, in any mode promotive of, and consistent with the purposes of establishing them as common highways. *
This paramount easement or. estate which the public acr ■quires in the streets, carrying with it a special interest in the adoption of the most approved systems of modern street travel, cannot be made subservient to the telegraph or telephone when admitted on the highway, without the clearest expression of the legislative will. In Hickok v. Hine, 23 Ohio St. 523, it was held, that when the legislature has power to *430 require one public easement to yield to another more important — a fortiori where the other is inferior — the intention to grant such power must appear by express words, or by necessary implication; and such implication arises only when requisite to the enjoyment of the powers expressly granted, and can be extended no further than such necessity requires. We fail to discover any authority, either express or impliéd, to subordinate the public easement in the streets to the privileges exercised thereon by the Telegraph Association, under the general terms of the statute permitting the erection of ■ posts, piers, and abutments necessary for its telephone wires, and especially when coupled with the condition, that the same shall not incommode the public in the use of the highway.
The demand made by the Telegraph Association is, not that the Railway Company shall so modify its existing electrical apparatus as not to interfere with the telephone service, but shall forever abandon the use of an essential part of its electro-motive system, or be perpetually enjoined. In other words, the Association claims the exclusive use of the grounded circuit, inasmuch as the mechanism of the telephone is so Complex, and the electric currents employed so delicate and sensitive, that they cannot be used without disturbance from the heavier currents employed by neighboring electrical enterprises that operate with the grounded circuit. We find no foundation for such an exclusive franchise or right. When the Telegraph Association began its operation under the- telephone system, neither the statute authorizing it! to erect and maintain poles, wires, and other necessary fixtures, nor the ordinance under which it obtained the power to-extend its lines in the streets, gave an exclusive right either to '-use the earth for a return circuit, or a complete metallic circuit formed by double wires. The legislature did not grant the right by general enactment, nor was the municipal Corporation empowered by the legislature to give the Telegraph Association the exclusive right to make use of its streets so as to create a monopoly. In State v. Cincinnati Gas Light and Coke Co., 18 Ohio St. 262, it was held, that a municipal *431 corporation cannot without clear legislative authority, grant an exclusive right to the use of the streets for certain purposes to an individual or corporation. To enable it to grant such an exclusive right by ordinance in the nature of a contract, the power must be shown to have been expressly granted, or to be so far necessary to the proper execution of the powers which are expressly granted, as to make its existence free from doubt.
■ In the year 1838, Professor Steinheil made the important discovery of the practicability of using the earth as one half, or the returning section of an electric circuit. Professor Morse claimed to have made the discovery about the same time, but he failed to obtain a patent therefor. It was the discovery of an elementary principle of science, of a truth in physics, of a law in the operation of the forces of nature, and was not bounded by the trammels of the patent law. For forty years before the telephone was discovered, the use of the earth as a conducting medium in the formation of an electric circuit, had been the common property of any electric enterprise. By what grant or title, then, did it become the especial, peculiar and exclusive franchise of the Telegraph Association ? As it did not originate in legislative or municipal grant, so, such exclusive franchise did not spring from priority in its exercise. Where a right is common and universal, and capable of being exercised by all at the same time, there is no applicability of the rule, that he who in its enjoyment is prior in point of time is prior in right. He who is first in the field does not thereby gain a monopoly of use.
■ It is contended, however, that the defendant in error, by virtue of its grants, acquired, before the Railway Company had a right to use electricity as a motive power, a vested interest in the telephone system as it now operates it, with a grounded circuit, and that not even the legislature of the state could take away from it or injure this franchise, on the faith of which it has expended its capital and labor. Special privileges or immunities are under the control of the legislature. If granted, they may be altered, revoked,, or *432 repealed by the general assembly. Art. 1, see. 2, of the Constitution. And, while corporations with valuable franchises may be formed under general laws, all such laws may, from time to time, be altered or repealed. Constitution, art. 13, see. 2. In view of these constitutional provisions, it is clearly within the power of the general assembly to authorize one class of corporations to use in the streets, electricity with the grounded circuit, as a motive power, and another class to employ the same or a similar agency for the transmission of telegraphic or telephonic messages. And, if the proper exercise of the rights granted to the one class under general law, is irreconcilable, and plainly interferes with a prior grant to a corporation of the other class, it may be construed as the intention of the legislature to deny an exclusive franchise, if not to repeal the antecedent grant.
In considering the advantages conferred upon them by the grant of their corporate rights, it is evident that the primary object or design of the state in granting the franchises of telegraph and telephone companies, is, in a large measure, to subserve the public benefit and convenience, and not the mere pecuniary advantage of the owners of the corporate property. The exercise of their corporate privileges is subordinate to the accomodation of those who travel on the streets or highways — “the profit to the proprietors being a mere mode of compensating them for their outlay of capital in providing and keeping up the public easement.” Shaw, C. J., in Commonwealth v. Temple, 14 Gray, 69, 77. It is in contemplation of such companies being thus subservient to the promotion of the public convenience and welfare, that the legislature has granted to them the privilege, among others, of exercising the power of eminent domain, by entering upon any land, and appropriating so much thereof as may be deemed necessary, for the erection and maintenance of poles, piers, abutments, wires, and other necessary fixtures.
Having received their corporate franchises from the state, they hold them in implied trust for the benefit of the community at large, and subject to the constitutional grant of legislative power to control the exercise of those franchises, *433 in the future, as the public good may require. A franchise, if granted by the state with a reservation of a right of repeal, must be regarded as a mere privilege while it is suffered to continue, and the legislature may take it away at any time, and the grantees must rely for the perpetuity and integrity of the franchise granted to them, solely upon the faith of the sovereign grantor. Pratt v. Brown, 3 Wis. 603; Cooley on Const. Lim., 472, (6 ed.) But in-the absence of such a reservation, its force and effect may be attained through the constitutional power vested in the general assembly to alter or repeal, from time to time, all general laws under which corporations are formed, and to alter, revoke, or repeal all special privileges or immunities that may have been granted.
In illustration of what we have said, is the case, Railway v. Railway, 30 Ohio St. 604. In that case, The Lake Shore and Michigan Southern Railway Company instituted proceedings to appropriate, for the construction of its railroad, the right and privilege of crossing with its track and way the track and way of The Cincinnati, Sandusky and Cleveland Railroad Company. It was the decision of the court, as set forth in the syllabus, that every railroad corporation in this state accepts its charter and franchises, and owns and uses its tracks, subject to the power of the state to authorize the construction of other railroads across its tracks whenever the public welfare may require. Neither the priority of one charter over the other, nor the prior location or construction of a railroad thereunder affects this right. Under the constitution and laws of this state, the right of one railroad corporation to cross the track of another in constructing and operating its road, is derived by grant of the franchise so to do from the state, and not by purchase or appropriation from the road first located and constructed. The latter has no vested exclusive right to such crossing for its use, against the right of the public, to a crossing. The court further held, that the railroad company, across whose track a right of way was condemned, could not recover for an injury to its franchise as a railroad; and that detention of trains, loss of future business, or additional expenses incident to the future exer *434 cise of its corporate powers, could not be taken into the account in estimating consequential damages.
. It is contended, however, in behalf of the defendant in error, that conceding the Railway Company and the Telegraph Association to be upon an equal footing on the streets and highways in the enjoyment of their respective franchises, the company is bound to conform to the rule sic utere tuo ut alienum non Icedas. In the view which we take of the relation to each other of the parties to the action, we deem it unnecessary to inquire, whether there has been a want of conformity, and to what extent, if any, on the part of the Railway Company, to the requirements of the legal maxim. Nor do we think it necessary to inquire, how far, the company making a lawful and careful use of its own property, or of a franchise granted to it by the proper municipal authorities, may be held liable for damages incidentally caused to the association.
From the undisputed facts in the case, as disclosed in the record and printed arguments of counsel, it is evident, as we have already seen, that the Railway Company acquired from the state and from the city of Cincinnati, authority to erect and maintain poles and wires in the streets or highways, and to use electricity as a motive power for its cars. Clothed with such authority, we have, upon weighing the allegations in the original petition, and applying to them the well settled principles governing the legal rights of the public in the highways, reached the conclusion, that the facts set forth in the petition are not sufficient to constitute a cause of action. We are of the opinion, that there has been no invasion of the rights of the Telegraph Association by the plaintiff in error, and that the Telegraph Association is not entitled to the relief prayed for in its petition. The judgment, therefore, of the superior court at general and special term must be reversed, and the original petition dismissed.

Judgment accordingly.